1  GINA M. ROCCANOVA (SBN 201594)
   JACKSON LEWIS P.C.
2  50 California Street, 9th Floor
   San Francisco, California  94111
3  Telephone:     (415) 394-9400
   Facsimile:      (415) 394-9401
4  gina.roccanova@jacksonlewis.com

5  BARBARA J. PARKER (SBN 69722)
   CITY ATTORNEY
6  RYAN G. RICHARDSON (SBN 223548)
   OAKLAND CITY ATTORNEY
7  1 Frank H. Ogawa Plaza
   Oakland, CA 94612
8  Telephone:     (510) 238-3601
   Facsimile:      (510) 238-6500
9  bjparker@oaklandcityattorney.org

10 Attorneys for Respondents CITY OF
   OAKLAND and POLICE COMMISSION
11 FOR THE CITY OF OAKLAND

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14

15 FRANCISCO NEGRETE, WILLIAM          Case No.
   BERGER, BRANDON HRAIZ, CRAIG
16 TANAKA, JOSEF PHILLIPS;             **DECLARATION OF GINA M.
                                       ROCCANOVE IN SUPPORT OF
17          Petitioners,               RESPONDENTS' NOTICE OF
                                       REMOVAL OF CIVIL ACTION TO
18     v.                              FEDERAL COURT PURSUANT TO 28
                                       U.S.C. §§ 1331 AND 1441 [FEDERAL
19 CITY OF OAKLAND; POLICE             QUESTION]**
   COMMISSION FOR THE CITY OF
20 OAKLAND; DOES 1 Through 10,         State Court Complaint Filed:     08/12/19
   INCLUSIVE,
21
            Respondents.
22

23

24      I, Gina M. Roccanova, declare:

25      1.     I am an attorney licensed to practice law in the State of California and admitted to

26 appear before this Court.  I am an attorney with the law firm of Jackson Lewis P.C., attorneys of

27 record in this matter for Respondents City of Oakland and Police Commission for the City of

28 Oakland (collectively "Respondents").  With the exception of matters based on information and

                                     1

belief, I have personal knowledge of the matters stated below, and if called to testify as to these matters, I could and would do so competently.

2.      Attached hereto as Exhibit A is a true and correct copy of Petitioners Francisco Negrete, William Berger, Brandon Hraiz, Craig Tanaka, and Josef Phillips (collectedly "Petitioners") Verified Petition for Writ of Traditional Mandate and Complaint for Declaratory Relief filed with the Alameda County Superior Court on August 12, 2019.

3.      Attached hereto as Exhibit B is a true and correct copy of the Petitioners' Proof of Service of Summons and Complaint filed with the Alameda County Superior Court on August 16, 2019.

4.      Attached hereto is as Exhibit C is a true and correct copy of all pleadings, processes, and orders filed in the Alameda County Superior Court case entitled *Francisco Negrete, William Berger, Brandon Hraiz, Craig Tanaka, and Josef Phillips v. City of Oakland and Police Commission for the City of Oakland*, Case No. RG19030784.

5.      Attached hereto as Exhibit D is a true and correct copy of the Order issued by the United States District Court Judge Thelton E. Henderson on December 12, 2012, requiring the City appoint a Compliance Director and enumerating certain specific duties of that position.

6.      Attached hereto as Exhibit E is a true and correct copy of the Compliance Director's Addendum to Oakland Police Department Executive Force Review Board Report, dated February 19, 2019.

7.      Attached hereto as Exhibit F is a true and correct copy of the Oakland Police Commission Discipline Committee Memorandum, dated July 15, 2019.

8.      The named Respondents in this action consent to this removal.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 12th day of September 2019 in San Francisco, California.

/s/ Gina M. Roccanova
Gina M. Roccanova

4829-8149-0596, v. 2

DECL. OF G. ROCCANOVA IN SUPPORT OF RESPONDENTS' NOTICE OF REMOVAL OF CIVIL ACTION
TO FEDERAL COURT PURSUANT TO 28 U.S.C. §§ 1331 AND 1441 [FEDERAL QUESTION]

# EXHIBIT A

Harry S. Stern, SBN 176854
Zachery A. Lopes, SBN 284394
**RAINS LUCIA STERN**
**ST. PHALLE & SILVER, PC**
220 Montgomery Street, 15th Floor
San Francisco, CA 94104
Telephone:  415.341.9341
Facsimile:  925.609.1690
Email: HStern@RLSlawyers.com
         ZLopes@RLSlawyers.com

Attorneys for Petitioners

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| FRANCISCO NEGRETE, WILLIAM BERGER, BRANDON HRAIZ, CRAIG TANAKA, JOSEF PHILLIPS;<br><br>           Petitioners,<br><br>      v.<br><br>CITY OF OAKLAND; POLICE COMMISSION OF THE CITY OF OAKLAND; DOES 1 THROUGH 10, INCLUSIVE;<br><br>           Respondents. | CASE NO.<br><br>**VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE; COMPLAINT FOR DECLARATORY RELIEF**<br><br>**[CODE CIV. PROC. §§ 1085, 1060]** |

        Petitioners Francisco Negrete, William Berger, Brandon Hraiz, Craig Tanaka, and Josef

Phillips (collectively, "Petitioners") seek a writ of traditional mandate pursuant to Code of Civil

Procedure section 1085, directed to and against Respondents City of Oakland, the Police Commission

of the City of Oakland, and Does 1 through 10 (collectively, "Respondents"), commanding them to

comply with the statutory procedure by which Oakland police officers are investigated for allegations

of workplace misconduct and disciplined as set forth in the City of Oakland's Charter and Municipal

Code. Petitioners also seek a judicial declaration establishing the proper application of specified

provisions of the City of Oakland's Charter and Municipal Code relative to the investigation and

discipline of Oakland police officers.

On or about March 11, 2018, Petitioners responded to a concerned resident's call about a man who was holding a firearm and situated between two residential buildings. Upon arriving on scene and confirming that the suspect was armed with a pistol, Petitioners set a perimeter and engaged in a concerted effort to disarm the suspect and bring him into custody without incident or the need for force. After peacefully attempting to disarm the suspect, including multiple direct commands to "get your hand off the gun," the suspect failed to comply and instead pointed the firearm towards the officers, prompting Petitioners Negrete, Berger, Hraiz and Tanaka to discharge their firearms in self-defense, and Petitioner Phillips to fire a non-lethal (bean bag) round in self-defense. The suspect died on scene.

Following the incident, the Oakland Police Department ("Department") initiated both a criminal investigation and administrative investigation into Petitioners' use of force. Both investigations, conducted separately, concluded that Petitioners' force was lawful and within Department policy. The Department's Executive Force Review Board – comprised of high-level Department command officers – and the Chief of Police separately agreed that Petitioners' force was lawful and within Department policy. The Office of the District Attorney of Alameda County, in its separate and independent investigation, also concluded that Petitioners' force was lawful. The City of Oakland's Community Police Review Agency – the investigative agency for the Police Commission of the City of Oakland – also concluded that Petitioners' force was lawful and within Department policy following its own independent investigation. In all, *six different investigations concluded that Petitioners' force was lawful and within Department policy*.

Despite these consistent findings, the City of Oakland's Police Commission directed the Chief of Police to terminate Petitioners' employment. As directed, the Chief of Police notified Petitioners that the City of Oakland intended to terminate their employment. Respondents' actions are unlawful for two reasons.

First, the Police Commission does not have jurisdiction to determine discipline in this case. Pursuant to the City of Oakland's Charter and Municipal Code, the Police Commission may only direct disciplinary action where its investigative agency (Community Police Review Agency) and the Chief

VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE

of Police disagree as to the investigatory findings or proposed discipline. In this case, however, both the Police Commission's investigative agency and the Chief of Police agreed that Petitioners' force was lawful and within Department policy, and therefore no misconduct occurred. Second, even if the Police Commission had lawful jurisdiction, pursuant to the City of Oakland's Charter and Municipal Code, the Police Commission's disciplinary determination must be based *solely* on the record presented by its investigative agency and the Chief of Police. In this case, the Police Commission explicitly relied on information other than that presented by its investigative agency and the Chief of Police.

Respondents' notified intent to terminate Petitioners' employment violates the City of Oakland's Charter and Municipal Code. Petitioners are entitled to a final determination that their use of force was lawful and within Department policy.

Petitioners allege as follows:

## PARTIES

1.     Petitioner Francisco Negrete is currently employed as a permanent non-probationary Police Sergeant by the City of Oakland, and is a peace officer pursuant to Penal Code section 830.1. He has been employed as a peace officer for approximately eleven years.

2.     Petitioner William Berger is currently employed as a permanent non-probationary Police Officer by the City of Oakland, and is a peace officer as defined by Penal Code section 830.1. He has been employed in this capacity for approximately five years.

3.     Petitioner Brandon Hraiz is currently employed as a permanent non-probationary Police Officer by the City of Oakland, and is a peace officer as defined by Penal Code section 830.1. He has been employed in this capacity for approximately five years.

4.     Petitioner Craig Tanaka is currently employed as a permanent non-probationary Police Officer by the City of Oakland, and is a peace officer as defined by Penal Code section 830.1. He has been employed in this capacity for approximately four years.

5.     Petitioner Josef Phillips is currently employed as a permanent non-probationary Police Officer by the City of Oakland, and is a peace officer as defined by Penal Code section 830.1. He has been employed in this capacity for approximately four years.

VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE

6.      Respondent City of Oakland ("City") is a political subdivision of the State of California duly constituted and operating as a charter city pursuant to Article XI, Sections 3, 5, 6 and 7 of the Constitution of the State of California.

7.      Respondent Police Commission of the City of Oakland ("Commission") is a subdivision of the City governed by and operating pursuant to Section 604 of the Charter of the City of Oakland ("Charter") and Chapters 2.45 and 2.46 of the City's Municipal Code.

8.      Respondents designated Does 1 through 10, inclusive, are presently unknown to Petitioners and are sued under such fictitious names. Each Respondent designated Doe was an agent, servant or employee of the City and/or Commission, and in doing the things hereinafter alleged, were acting within the scope of their authority with the permission and consent of the City and Commission. Each Respondent designated doe is responsible in some manner for the actions alleged herein and is subject to the relief and orders requested by Petitioners.  Petitioners will amend this Petition to allege the true names and capacities of Does 1 through 10 when ascertained.

## GENERAL ALLEGATIONS

### ARTICLE XI OF THE CONSTITUTION OF THE STATE OF CALIFORNIA

9.      At all times relevant, Article XI, Section 3(a) of the Constitution of the State of California provided in pertinent part that the provisions of an adopted city charter "are the law of the State and have the force and effect of legislative enactments."

10.      At all relevant times, Article XI, Section 5(a) of the Constitution of the State of California provided in pertinent part that city charters may "provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters," and that, "with respect to municipal affairs" city charters "shall supersede all laws inconsistent therewith."

11.      At all times relevant, Article XI, Section 5(b) of the Constitution of the State of California provided in pertinent part that city charters may provide for "the constitution, regulation, and government of the city police force," and that "plenary authority is hereby granted, subject only to the restrictions of [Article XI], to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and

employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."

12.    At all times relevant, Article XI, Section 6 of the Constitution of the State of California provided that "all cities [] may consolidate as a charter city [] as provided by statute."

13.    At all times relevant, Article XI, Section 7 of the Constitution of the State of California provided that cities "may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

<div align="center">CITY CHARTER AND MUNICIPAL CODE</div>

14.    At all times relevant, Article I, Section 106 "General Powers" of the Charter provided:

> The City shall have the right and power to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this Charter; provided, that nothing herein shall be construed to prevent or restrict the City from exercising or consenting to, and the City is hereby authorized to exercise, any and all the rights, powers and privileges heretofore or hereafter granted or prescribed by the general laws of the State including those specifically applicable to general law cities; provided, also, that where the general laws of the State provide a procedure for the carrying out and the enforcement of any rights or powers belonging to the City, said procedure shall control and be followed unless a different procedure shall have been provided in the Charter or by ordinance.

> It is the intention of the people in adopting this section to take advantage of the provisions of Section 6 of Article XI of the Constitution of the State of California giving cities Home Rule as to municipal affairs.

15.    At all times relevant, Article 5, Section 503 "Powers of Appointment and Removal" of the Charter provided:

> The City Administrator shall be responsible to the Council for the proper and efficient administration of all affairs of the City under his jurisdiction, and shall, subject to the provisions of Article IX of this Charter and except as otherwise provided in this Charter, have the power to appoint, assign, reassign, discipline and remove all directors or heads

<div align="center">5</div>

of departments and all employees under his jurisdiction. He may delegate to directors or other department heads responsible to him/her the authority to appoint, discipline and remove subordinate employees, subject to the provisions of Article IX of this Charter.

16.    In November of 2016, City residents passed a Charter amendment entitled "Measure LL." Broadly, Measure LL amended the Charter by adding a new provision – Section 604 "Police Commission" – establishing the Commission, the Community Police Review Agency ("Agency"), and setting forth a detailed procedure for the investigation of allegations of workplace misconduct against sworn members of the Department and disciplinary determinations following such investigations.

17.    Section 604 generally empowers the Commission to: (a) review Department policies and procedures governing use of force, profiling and general assemblies, and propose changes for submission to the City Council for approval or rejection, (b) review and comment on other Department policies and procedures, (c) conduct public hearings on Department policies and procedures, (d) review the Mayor's proposed Department budget, (e) require the Chief of Police to submit annual reports for review, (f) oversee the Agency, and (g) act separately or jointly with the Mayor to remove the Chief of Police under specified conditions.

18.    Section 604 generally empowers the Agency, as the Commission's investigative body, to investigate public complaints alleging misconduct by sworn members of the Department. Upon completion of an investigation, the Agency is required to issue written findings and proposed discipline to the Commission and the Chief of Police.

19.    Section 604 also empowers the Chief of Police to investigate the conduct of Department sworn employees, by stating that "[n]othing herein shall prohibit the Chief of Police or a commanding officer from investigating the conduct of a Department sworn employee under his or her command…."

20.    For final disciplinary determinations, Section 604 sets forth a bifurcated process. If the Chief of Police and Agency are in agreement as to the investigatory findings and proposed discipline, the process is complete, and the Chief of Police notifies the subject sworn member(s) of the disposition. If discipline is imposed, the sworn member is then entitled to invoke pre- and post-deprivation due process and administrative appeal rights to contest that discipline. If, on the other hand, the Chief of Police and Agency are in disagreement as to the investigatory findings and/or

proposed discipline, the matter is submitted to a "Discipline Committee" ("Committee") comprised of three members of the Commission. The Committee is then tasked with resolving the dispute and delivering its determination to the Chief of Police to notify the subject sworn member(s) and commence the administrative process if discipline is imposed.

21.     Section 604(g)(1) states "[i]f the Chief of Police agrees with the Agency's findings and proposed discipline, he or she shall send to the subject officer notification of findings and intent to impose discipline." Section 604(g)(2) states "[i]f the Chief of Police disagrees with the Agency's findings and/or proposed discipline, the Chief of Police shall prepare his or her own findings and/or proposed discipline which shall be submitted to a Discipline Committee comprised of three Commissioners … The Agency's findings and proposed discipline shall also be submitted to the Discipline Committee *which shall review both submissions and resolve any dispute between the Agency and the Chief of Police*." (Emphasis added.)

22.     The Committee's determination must be based solely on the record presented by the Chief of Police and the Agency. The Committee does not have the authority to conduct its own investigation.

23.     In or around July 2018, the City Council adopted Ordinance No. 13498, enacting two new chapters – Title II, Chapter 2.45 "Oakland Police Commission" and Chapter 2.46 "Community Police Review Agency" – of the City's Municipal Code to implement the terms of Section 604.

24.     Chapters 2.45 and 2.46 largely replicate the investigatory and discipline determination provisions of Charter Section 604. Specifically, it restates the bifurcated process by which investigative findings and disciplinary determinations are made – either by agreement between the Chief of Police and Agency, or determination by the Committee where the Chief of Police and Agency disagree.

25.     Chapter 2.45.130 states directly that "*Discipline Committees shall decide any dispute between the Agency and the Chief* regarding the proposed or final findings or proposed or final level of discipline to be imposed on a subject officer." (Emphasis added.)

26.     Chapter 2.45.140(C) states that "[a]fter the investigation of a complaint has been completed and a decision has been made regarding the proposed findings and the proposed level of

discipline [], *either by agreement between the Chief and the Agency or by decision of the Discipline Committee*, the Chief shall send a notice of intent to impose discipline or a notice of intent to terminate to the subject officer." (Emphasis added.)

27.    After the required notices of intent to impose discipline have been provided to the subject sworn member, Chapter 2.45.140 sets forth the pre-disciplinary administrative "Skelly" process pursuant to *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194. Specifically, Chapter 2.45.140 states that the "Skelly report" completed after a Skelly hearing "shall be submitted to the Chief and to the Agency Director if the Chief and Agency Director agreed on the Proposed Discipline," to come to a final disciplinary decision. If the Chief and Agency Director cannot agree, then the Committee is tasked with reviewing the Skelly report and determining final discipline. If, however, the Committee decided the proposed discipline, then it receives the Skelly report directly.

28.    Chapter 2.45.140(F) states that "[a]fter final discipline has been determined by *either the agreement of the Agency Director and the Chief, or by the Discipline Committee* [] the complainants(s) shall be informed of the disposition of the complaint." (Emphasis added.)

29.    Chapter 2.45 defines the term "Chief" as "Chief of Police of the Oakland Police Department."

30.    Chapter 2.45 also reaffirms the Commission's authority to remove the Chief of Police under specified conditions, annually review the performance of the Chief of Police, and direct the preparation of the Chief of Police's annual report to the Commission.

MARCH 2018 OFFICER INVOLVED SHOOTING AND SUBSEQUENT INVESTIGATIONS

31.    On or about March 11, 2018, Petitioners were dispatched to a scene involving a suspect armed with a pistol. The incident culminated in Petitioners Negrete, Berger, Hraiz and Tanaka discharging their firearms ("OIS"), resulting in the death of the armed suspect. Petitioner Phillips discharged a non-lethal projectile (bean bag) round.

32.    In response to the OIS, the Department immediately commenced both an administrative investigation through its Internal Affairs Division ("IAD"), and a separate criminal investigation through its Criminal Investigations Division ("CID") into Petitioners' use of force and conduct during the incident.

33.     Additionally, pursuant to Department policy, the Department convened an "Executive Force Review Board" ("EFRB") to administratively investigate and review the incident and Petitioners' use of force. The EFRB was comprised of three "voting members" – a Field Operations Deputy Chief, and two Patrol Captains. The EFRB also included seven "non-voting members" – the Department's Training Division Commander (Captain), IAD Commander (Captain), Force Investigations Commander (Lieutenant), and a technical writer, video technician, use of force coordinator, and an attorney from the City Attorney's Office. A retired United States Magistrate Judge attended the EFRB proceedings as a neutral observer.

34.     The IAD investigation of Petitioners' use of force was completed in or around October 2018. That investigation concluded that each Petitioner's use of force was objectively reasonable under the law and in compliance with Department policy. IAD concluded that each Petitioner be "exonerated" of the allegation that they used unreasonable or unlawful force.

35.     The CID Investigation of Petitioners' use of force was also completed in or around October 2018. That investigation also concluded that each Petitioner's use of force was objectively reasonable under the law.

36.     The EFRB reviewed the IAD and CID investigations, including analyzing body worn camera video of the OIS, witness statements, sworn personnel statements, and the analysis and testimony from Department-designated subject matter experts on topics such as patrol tactics, firearm deployment, and critical incident training, among others. In or around February 2019, the EFRB issued a report which unanimously concluded that each Petitioner's use of force was objectively reasonable under the law and in compliance with Department policy, and that each Petitioner was "exonerated" of the allegation that they used unreasonable or unlawful force.

37.     Also in or around February 2019, pursuant to Charter Section 604(a)(3) the Department's Chief of Police issued an addendum to the EFRB's Report following her separate review of the incident in which she agreed with the EFRB's conclusion that each Petitioner's use of force was objectively reasonable and in compliance with Department Policy, and therefore that each Petitioner was "exonerated" of the allegation that they used unreasonable or unlawful force.

/ / /

38.     On or about March 6, 2019, the Alameda County District Attorney's Office ("DA") issued its own independent analysis of the OIS, also finding that the use of force was reasonable and lawful, and therefore formally declining to pursue criminal charges against Petitioners Negrete, Berger, Hraiz and Tanaka. Petitioner Phillips, having only discharged a non-lethal projectile, was not a subject of the DA's investigation.

39.     On or about April 22, 2019, the Commission's investigative body – the Agency – issued its own independent analysis of the OIS, also finding that each Petitioner's use of force was objectively reasonable and in compliance with Department policy, and therefore that each Petitioner was "exonerated" of the allegation that they used unreasonable or unlawful force – conforming exactly to the findings of the Department's Chief of Police.

40.     Accordingly, six separate and independent reviews of Petitioners' use of force – IAD, CID, EFRB, Chief of Police, DA, and Agency – unanimously concluded that each of the Petitioners' use of force was lawful. Every City administrative review of the force used – IAD, EFRB, Chief of Police, Agency – unanimously "exonerated" each Petitioner of the allegation that they used unreasonable or unlawful force.

41.     Department policy defines a finding of "exoneration" to mean that "[a] preponderance of the evidence proves that the alleged conduct occurred but that the conduct was justified, lawful, or proper."

PETITIONERS' PLACEMENT ON INVOLUNTARY ADMINISTRATIVE LEAVE

42.     Despite being unanimously exonerated by every City administrative review of the OIS, beginning on or about March 12, 2019, the Chief of Police placed each Petitioner on involuntary administrative leave, suspended their peace officer powers, and restricted their access to Department facilities to that of a private citizen. Each Petitioner was informed that these actions were being taken in furtherance of the OIS investigation, without further detail.

43.     In a letter dated June 11, 2019, with Petitioners still on administrative leave, Petitioners' counsel sent a letter to the Chief of Police demanding immediate reinstatement in light of the Charter and Municipal Code, their unanimous exoneration by the Chief of Police and Agency of unreasonable force allegations, and their right to be free from punitive action absent due process and the opportunity

1   of administrative appeal.

2       44.    The next day, the Chief of Police responded via email that she was "recused from this

3   matter" without further explanation, and she "should not be included in any further communication

4   regarding this OIS." The Chief of Police also stated that she had forwarded the letter to "Chief

5   Warshaw," and directed Petitioners' counsel to "reach out" to the City Attorney's Office.

6       45.    In a letter dated June 28, 2019 to the City Attorney, Petitioners' counsel again

7   demanded Petitioners' reinstatement, and attached the prior June 11, 2019 letter sent to the Chief of

8   Police. The City Attorney's Office never responded to the June 28, 2019 letter.

9   <u>THE COMPLIANCE DIRECTOR</u>

10       46.    The Chief of Police's mention of "Chief Warshaw" referred to Robert Warshaw, the

11   Compliance Director appointed by the United States District Court, Northern District of California

12   ("District Court") to facilitate the City's compliance with a "Negotiated Settlement Agreement"

13   ("NSA") entered into between the City as a party defendant and plaintiffs in the matter of *Delphine*

14   *Allen, et al. v. City of Oakland, et al.*, Case No. C00-4599 ("*Allen*").

15       47.    Over sixteen years ago, in or around January 2003, the City as a party defendant settled

16   the *Allen* plaintiffs' allegations of a "pattern and practice" of civil rights violations with a monetary

17   payment and execution of the NSA. The NSA, generally, sets forth various "tasks" to be completed by

18   the Department in furtherance of establishing and maintaining constitutionally-compliant police

19   practices.

20       48.    To facilitate compliance with these tasks, the NSA established the position of

21   "Monitor" and set forth the Monitor's duties, responsibilities and authority. The NSA states that the

22   Monitor "is not intended to [] replace or take over the role or duties of the Chief of Police or other

23   police or City officials."

24       49.    The NSA also states that its terms are not "intended to alter the existing collective

25   bargaining agreement between the City and [Department] member/employee bargaining units or to

26   impair the collective bargaining rights of [Department] member/employee bargaining units under state

27   law or local law."

28   / / /

VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE

50.     The NSA contemplates Monitor review of Department use of force investigations, stating that should the Monitor determine that any such investigation is inadequate under the NSA, the Monitor shall confer with the Chief of Police, among other Department officials, and prepare a confidential memorandum to the Department and District Court. The Monitor's evaluation of such investigations is for the purpose of "assisting the Chief of Police on conducting future investigations, and shall not obligate the Department to reopen or re-adjudicate any investigation."

51.     In an order dated January 24, 2012 the District Court conferred additional authority on the Monitor beyond that set forth in the NSA. Specifically, the District Court directed the Department to "consult" with the Monitor on "personnel decisions," including "disciplinary actions in Class I misconduct cases" such as using lethal force in violation of Department policy. The District Court further directed a procedure to review any City decision implemented against the recommendation of the Monitor. The District Court's January 24, 2012 order states in pertinent part:

> "the Court now confers additional authority on the Monitor as follows:
>
> …effective immediately, the Chief must regularly consult with the Monitor on all major decisions that may impact compliance with the NSA, including but not limited to:
>
> …
>
> •     Personnel decisions, including promotions, engagement of consultants, and disciplinary actions in Class I misconduct cases;
>
> …
>
> If, after consultation with the Monitor, the Chief intends to take action against the Monitor's recommendation, then the Monitor shall discuss the intended action with the City Administrator and Mayor…
>
> If the City ultimately implements a decision against the Monitor's recommendation, then the Court may schedule a hearing to determine whether it should order that the Monitor's recommendation be implemented. At any such hearing, the City will bear the burden of persuading the Court that its failure to follow the Monitor's recommendation will not have a negative impact on the City's compliance efforts.

/ / /

52.     In an order dated December 12, 2012, the District Court established the position of Compliance Director, which was vested with "the same rights and privileges as have already been agreed to and/or ordered with respect to the Monitor…." In addition to having authority to remove the Chief of Police, the Compliance Director was vested with the authority to direct action by the City or Department to facilitate compliance with the NSA. The District Court's December 2012 order states in pertinent part:

> The Compliance Director will have the authority to direct specific actions by the City or OPD to attain or improve compliance levels, or remedy compliance errors, regarding all portions of the NSA and AMOU, including but not limited to: … (2) personnel decisions, including but not limited to promotions; engagement of consultants; assignments; findings and disciplinary actions in misconduct cases and use-of-force reviews; the discipline or demotion of OPD officers holding the rank of Deputy Chief and Assistant Chief; and the discipline, demotion, or removal of the Chief of Police…

53.     The additional authority relating to "findings and disciplinary actions in misconduct cases and use-of-force reviews" conferred on the Compliance Director by the District Court's December 12, 2012 Order was not part of the NSA agreed to between the *Allen* plaintiffs and the City.

54.     The District Court's December 12, 2012 order also reaffirmed that Department employees' collective bargaining rights cannot be impaired, stating in pertinent part:

> the Compliance Director's exercise of authority will be limited by the following:
> …
>
> b. Members of the OPD up to and including the rank of Captain will continue to be covered by the Meyers-Milias-Brown Act, the collective bargaining agreement, and OPOA members' rights to arbitrate and appeal disciplinary action. The Compliance Director will have no authority to abridge, modify, or rescind any portion of those rights for these members.
>
> c. The Compliance Director will have no authority to rescind or otherwise modify working conditions referenced in the labor agreements between the City and the OPOA as those contracts relate to any member up to and including the rank of Captain. "Working conditions" include the rights identified in the above subparagraph, as well as salary, hours, fringe benefits, holidays, days off, etc.

55.     In an order dated July 22, 2014, the District Court "reiterate[d]" that the Department and City "will not implement any of the types of changes or actions identified in the January 24, 2012 order without the Compliance Director's direction or approval." The order specifically identifies such "actions" as including "disciplinary actions in Class I misconduct cases." The District Court instructed the City and Department that "no discipline in Class I misconduct cases can be imposed absent the Compliance Director's direction or approval. If the City disagrees with the Compliance Director, it must follow the dispute resolution process set forth in the December 12, 2012 order." The District Court's instruction regarding the Compliance Director's "direction or approval" in misconduct cases was not part of the NSA agreed to between the *Allen* plaintiffs and City.

56.     In the instant case, in addition to the Chief of Police, the Compliance Director also issued an addendum to the EFRB's OIS Report. The Compliance Director claimed that each Petitioner violated the Department's use of force policy. The addendum does not set forth any recommended discipline.

THE CITY'S NOTIFICATION OF INTENT TO TERMINATE PETITIONERS' EMPLOYMENT

57.     Beginning on or about July 11, 2019, each Petitioner was served with a letter signed by the Chief of Police asserting that the City "intends to terminate" their employment. The letters further stated that the intended termination "result[ed] from the [sic] Oakland Police Commission Discipline Committee and its review of" the Agency investigation of the OIS, which had determined that their conduct was "out of compliance, in violation of Oakland Police Department rules, regulations, or policies." The letters informed Petitioners that "[a] date and time for [their] Skelly Hearing[s] will be scheduled shortly," and that they would be "notified in ample time to respond to the facts contained in this letter."

58.     None of the Petitioners were provided any factual or analytical basis for the City's decision to terminate, or how such a determination was made following their unanimous exoneration of unreasonable force allegations by IAD, EFRB, Chief of Police, and AGENCY.

59.     Shortly thereafter, each Petitioner separately demanded Skelly materials. After a requested clarification on the process by which Skelly materials would be provided, the City

/ / /

Attorney's Office informed Petitioners' counsel that IAD is compiling the Skelly materials separately for each client.

60.     In email correspondence dated July 17, 2019, in advance of waiting on IAD to complete the entire Skelly packet for each Petitioner, Petitioners' counsel specifically requested to be provided "any documents reflecting the bas[is] or reasons for the Police Commission's disciplinary decisions … In other words, if the Commission issued an analysis, report, findings, etc., or anything similar, for each individual case or the [OIS] as a whole, we're most immediately interested in reviewing that." The City Attorney's Office did not respond to that specific request.

THE CITY'S PUBLIC DISSEMINATION OF TWO VERSIONS OF THE DISCIPLINE COMMITTEE'S "FINDINGS"

61.     The next day, July 18, 2019, the City publicly released the Committee's "findings" with respect to its review of the OIS. Petitioners first read about the purported bases for the City's noticed intent to terminate their employment in various news media, as they had still not received the document itself from their employer. Nor had the City Attorney's Office responded to Petitioners' counsel's request for that very document the day prior. Petitioners' counsel downloaded the Committee's findings from a City website address provided by a news reporter.

62.     The July 18, 2019 document setting forth the Committee's findings ("Initial Committee OIS Report") was identified on the City's website as "Discipline Committee Report Recommendation." Its analysis of the facts of the OIS began mid-sentence at the top of page 5, despite the document's sequential numbering. Ultimately, the document stated that the Committee found each Petitioner's use of force was "out of compliance with [Department] policy," and concluded that termination was the appropriate discipline.

63.     Notably, the document included an express statement of the Committee's asserted jurisdiction – it claimed that the Compliance Director's review of the incident "stand[s] in the place" of the Department's – thereby creating "conflicting findings and proposed discipline by [the Agency] and Chief Warshaw" affording it jurisdiction to decide the matter.

64.     The document lists three separate reports by the Compliance Director setting forth his review: (1) the February 19, 2019 addendum to the EFRB report, (2) a June 12, 2019 Memorandum Re Discipline, and (3) a June 27, 2019 supplemental document to his earlier report and memorandum.

65.     Neither Petitioners nor their counsel have been provided a June 12, 2019 "Memorandum Re Discipline" or a June 27, 2019 "supplemental document." This, despite Petitioners' counsel's June 11, 2019 letter to the Chief of Police which she forwarded to the Compliance Director that same day, and June 28, 2019 letter to the City Attorney's Office.

66.     On July 25, 2019, the City Attorney's Office informed Petitioners' counsel that a "revised" document setting forth the Committee's findings was released ("Revised Committee OIS Report"), and provided a link to the City's website. This document was identified on the City's website as "OPC – Discipline Committee Memo." The findings and disciplinary decision for each Petitioner remains the same in the revised document.

67.     Petitioners remain in administrative leave status, and as of the filing of this Petition, have not received the requested Skelly materials and Skelly Hearing dates have not been set.

## TRADITIONAL MANDATE

### Code of Civil Procedure § 1085

68.     Petitioners reallege and incorporate paragraphs 1 through 67 as though fully set forth herein.

69.     Pursuant to the express terms of Section 604 of the Charter, Committees may only be established to make disciplinary determinations for Department sworn personnel where the Chief of Police and Agency are in disagreement as to investigatory findings or proposed discipline. If the Chief of Police agrees and the Agency agree on the findings and proposed discipline, the Chief of Police is vested with final decision-making authority and the Committee does not have jurisdiction.

70.     Pursuant to the express terms of Title II, Chapter 2.45 "Police Commission" of the Municipal Code, Committees may only be established to make disciplinary determinations for Department sworn personnel where the Chief of Police and Agency are in disagreement as to investigatory findings or proposed discipline. Chapter 2.45.130 states directly that "Discipline Committees *shall decide any dispute between the Agency and the Chief* regarding the proposed or final findings or proposed or final level of discipline to be imposed on a subject officer."

71.     Chapter 2.45.140(C) states that "[a]fter the investigation of a complaint has been completed and a decision has been made regarding the proposed findings and the proposed level of

discipline [], *either by agreement between the Chief and the Agency or by decision of the Discipline Committee*, the Chief shall send a notice of intent to impose discipline or a notice of intent to terminate to the subject officer." (Emphasis added.) Chapter 2.45.140(F) states that "[a]fter final discipline has been determined by *either the agreement of the Agency Director and the Chief, or by the Discipline Committee* [] the complainants(s) shall be informed of the disposition of the complaint." (Emphasis added.)

72. The Committee's reliance on the Compliance Director's review of Petitioners' conduct during the OIS violates the Charter and Municipal Code. Pursuant to Section 604 of the Charter and Chapter 2.45 of the Municipal Code, the Chief of Police means the "Chief of Police of the Oakland Police Department." Neither the Charter nor Chapter 2.45 or 2.46 of the Municipal Code grant any authority to, or mention, the Compliance Director appointed in the *Allen* litigation to facilitate compliance with a settlement agreement between two litigants. Moreover, even where properly constituted, the Committee's determination must be based solely on the record presented by the Chief of Police and Agency.

73. Neither the City nor the Commission were directed by the Compliance Director to take any specific disciplinary action relative to Petitioners' conduct during the OIS.

74. As set forth above, the Chief of Police and Agency were in agreement that Petitioners are "exonerated" of the allegation that they used unlawful or non-compliant force during the OIS. Both the Chief of Police and Agency agreed that such force was lawful and within Department policy. Accordingly, pursuant to Section 604 of the Charter and Chapter 2.45 of the Municipal Code, Petitioners have been formally exonerated and the Committee does not have jurisdiction or authority to impose disciplinary action.

75. Respondents have a clear, present, and ministerial duty to comply with Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code. Respondents also have a clear, present, and ministerial duty to comply with Article XI, Sections 3, 5, and 7 of the Constitution of the State of California. The Charter represents the supreme law of the City, subject only to conflicting provisions in the federal and state constitutions and to preemptive state law.

/ / /

76.     Respondents have at all times been able to comply, and at all times will be able to comply, with its legal obligation to abide by Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code. Petitioners have demanded that Respondents so comply, and they have refused. There are no conflicting provisions in the federal or state constitutions or preemptive state law preventing Respondents' compliance.

77.     Petitioners are beneficially interested in the issuance of a writ of mandate commanding Respondents to comply with their ministerial obligations under Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code. Pursuant to these governing provisions, Petitioners have been exonerated of all unreasonable or unlawful force allegations arising from their conduct during the OIS in accordance with the Charter and Municipal Code. Petitioners have a well-established right to ensure that Respondents strictly follow the statutory procedures governing the imposition of disciplinary action.

78.     Petitioners have suffered, and will continue to suffer, great and irreparable harm as a result of Respondents' failure and refusal to comply with its ministerial obligations under Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code.

79.     Petitioners have no plain, speedy, or adequate remedy in the ordinary course of law, other than the relief sought herein, in that monetary damages are inadequate to compensate for Respondents' refusal to comply with their ministerial obligations under Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code.

80.     Petitioners are not required to exhaust any administrative remedies prior to initiating this legal action.

## DECLARATORY RELIEF

### Code of Civil Procedure § 1060

81.     Petitioners re-allege paragraphs 1 through 80 as though fully set forth herein.

82.     An actual and justiciable controversy has arisen, and now exists, between Petitioners and Respondents as to whether: (a) the Committee may assert jurisdiction to determine disciplinary action on Department sworn personnel based on a disagreement between the Compliance Director's and Agency's findings and proposed discipline, (b) the Compliance Director's findings and proposed

discipline "stand[] in the place of" the Chief of Police's findings and proposed discipline, and (c) the Committee has authority to make a disciplinary determination based on review of material from outside of the record presented by the Chief of Police and Agency.

83.     This controversy is a proper subject for declaratory relief because the parties are in fundamental disagreement over the proper application of the statutory procedures set forth in Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code.

84.     There are no effective administrative remedies available to Petitioners to compel the relief sought herein.

WHEREFORE, Petitioners pray for the relief set forth below.

## PRAYER

Petitioners respectfully request that the court enter judgment in their favor and against the City, Commission, Does 1 through 10, inclusive, their committees, agents, employees and anyone or any entity acting on their behalf as follows:

1.     For a peremptory writ of mandate commanding Respondents to comply immediately with Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code, by formally exonerating each Petitioner of misconduct allegations relative to their use of force during the OIS;

2.     For appropriate injunctive relief restraining Respondents from maintaining or imposing any disciplinary action on Petitioners arising from their use of force during the OIS;

3.     For a judicial declaration establishing that: (a) the Committee may not assert jurisdiction to determine disciplinary action on Department sworn personnel based on a disagreement between the Compliance Director's and Agency's findings and proposed discipline, (b) the Compliance Director's findings and proposed discipline do not "stand[] in the place of" the Chief of Police's findings and proposed discipline for investigations of alleged misconduct of Department sworn personnel, and (c) the Committee does not have authority to review material from outside the record presented by the Chief of Police and Agency when making a disciplinary determination;

4.     For an award of attorney fees as otherwise authorized by law;

5.     For an award of costs of suit incurred in this action; and

/ / /

1       6.      For such other and further relief as the court deems just and proper.

Dated: August 12, 2019              Respectfully submitted,

**RAINS LUCIA STERN**
**ST. PHALLE & SILVER, PC**

By: _____
         Zachery A. Lopes
         Attorneys for Petitioners

**VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE**

# EXHIBIT B

22836705

**FAXED**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
HARRY S. STERN (SBN 176854)
RAINS LUCIA STERN et al.
2300 CONTRA COSTA BLVD., #500
PLEASANT HILL, CA 94523
TELEPHONE NO.: (925) 609-1699     FAX NO. *(Optional):* (925) 905-9250
E-MAIL ADDRESS *(Optional)*:
ATTORNEY FOR *(Name)*: FRANCISCO NEGRETE, WILLIAM BERGER, BRANDON HRAIZ, CRAIG TANAKA, JOSEF PHILLIPS

FOR COURT USE ONLY

**FILED**
ALAMEDA COUNTY

AUG 16 2019

CLERK OF THE SUPERIOR COURT
By _Tania_ [signature]  Deputy

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
STREET ADDRESS: 1225 FALLON STREET
MAILING ADDRESS: SAME AS ABOVE
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: ALAMEDA SUPERIOR COURT

PLAINTIFF/PETITIONER: FRANCISCO NEGRETE, WILLIAM BERGER, BRANDON HRAIZ, CRAIG TANAKA, JOSEF PHILLIPS,
DEFENDANT/RESPONDENT: CITY OF OAKLAND, et al.

CASE NUMBER:
RG19030784

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:
RAILUPH-0004483.MB |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ Summons
   b. ☑ Verified Petition for Writ of Traditional Mandate; Complaint for Declaratory Relief
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☐ Other *(specify documents)*:

3. a. Party served *(specify name of party as shown on documents served)*:
   POLICE COMMISSION OF THE CITY OF OAKLAND

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   NIKKI LA, PUBLIC SERVICE REP, AUTHORIZED TO ACCEPT

4. Address where the party was served: 1 FRANK H OGAWA PLAZA, 6TH FLOOR , OAKLAND , CA 94612

5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: 08/13/2019     (2) at *(time):* 2:03pm
   b. ☐ **by substituted service.** On *(date):*        at *(time):*        I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ.Proc., § 415.20). I mailed the documents on *(date)*:        from *(city)*:        or ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure: § 417.10 |
|---|---|---|

| PLAINTIFF/PETITIONER: FRANCISCO NEGRETE, WILLIAM BERGER, BRANDON HRAIZ, CRAIG TANAKA, JOSEF PHILLIPS, | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: CITY OF OAKLAND, et al. | RG19030784 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date)*:               (2) from *(city)*:

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgment of Receipt).* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested.   (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

  a. ☐ as an individual defendant.

  b. ☐ as the person sued under the fictitious name of *(specify):*

  c. ☐ as occupant.

  d. ☑ On behalf of *(specify):*   POLICE COMMISSION OF THE CITY OF OAKLAND

    under the following Code of Civil Procedure section:

    ☐ 416.10 (corporation)           ☐ 415.95 (business organization, form unknown)

    ☐ 416.20 (defunct corporation)       ☐ 416.60 (minor)

    ☐ 416.30 (joint stock company/association).  ☐ 416.70 (ward or conservatee)

    ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)

    ☑ 416.50 (public entity)             ☐ 415.46 (occupant)

                                    ☐ other:

7. **Person who served papers**

  a. Name: RAUL DELEON

  b. Address: PO Box 861057, Los Angeles, California 90086

  c. Telephone number: (213) 975-9850

  d. **The fee for service was: $**

  e. **I am:**

    (1) ☐ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☑ registered California process server:

        (i) ☐ owner  ☐ employee  ☑ independent contractor.

        (ii) Registration No.:1202

        (iii) County: SANTA CLARA

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    **or**

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 8/14/2019

RAUL DELEON
_____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶                                     _____
                                         (SIGNATURE)

# EXHIBIT C

-228368091C

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Harry S. Stern / Zachery A. Lopes    SBN: 176854 / 284394<br>RAINS LUCIA STERN ST. PHALLE & SILVER PC<br>220 Montgomery Street, 15th Floor, San Francisco, CA 94104<br>TELEPHONE NO.: 415.341.9341    FAX NO.: 925.609.1690<br>ATTORNEY FOR *(Name):* Petitioners, Francisco Negrete, et al. | **FILED**<br>**ALAMEDA COUNTY**<br><br>AUG 12 2019<br><br>CLERK OF THE SUPERIOR COURT<br>By _____<br>Deputy |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA<br>STREET ADDRESS: 1225 Fallon St.<br>MAILING ADDRESS: 1225 Fallon St.<br>CITY AND ZIP CODE: Oakland, 94612<br>BRANCH NAME: Rene C. Davidson Alameda County Courthouse | |
| CASE NAME: Francisco Negrete, et al. v. City of Oakland, et al. | |

**FAXED**

| CIVIL CASE COVER SHEET<br>[X] Unlimited    [ ] Limited<br>(Amount    (Amount<br>demanded    demanded is<br>exceeds $25,000)    $25,000 or less) | Complex Case Designation<br>[ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>Rg 19030984<br>JUDGE:<br>DEPT: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation**<br>**(Cal. Rules of Court, rules 3.400–3.403)** |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46) | [ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09)<br>[ ] Other collections (09)<br>[ ] Insurance coverage (18)<br>[ ] Other contract (37) | [ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10)<br>[ ] Mass tort (40)<br>[ ] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30) |
| **Other PI/PD/WD (Personal Injury/Property**<br>**Damage/Wrongful Death) Tort**<br>[ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23) | **Real Property**<br>[ ] Eminent domain/Inverse<br> condemnation (14)<br>[ ] Wrongful eviction (33)<br>[ ] Other real property (26) | [ ] Insurance coverage claims arising from the<br> above listed provisionally complex case<br> types (41)<br>**Enforcement of Judgment**<br>[ ] Enforcement of judgment (20) |
| **Non-PI/PD/WD (Other) Tort**<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35) | **Unlawful Detainer**<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>**Judicial Review**<br>[ ] Asset forfeiture (05)<br>[ ] Petition re: arbitration award (11)<br>[X] Writ of mandate (02)<br>[ ] Other judicial review (39) | **Miscellaneous Civil Complaint**<br>[ ] RICO (27)<br>[ ] Other complaint *(not specified above)* (42)<br>**Miscellaneous Civil Petition**<br>[ ] Partnership and corporate governance (21)<br>[ ] Other petition *(not specified above)* (43) |
| **Employment**<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | | |

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [ ] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive

4. Number of causes of action *(specify):* Two

5. This case [ ] is  [X] is not  a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 12, 2019

Zachery A. Lopes
_____
(TYPE OR PRINT NAME)          ▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov*<br>Westlaw Doc & Form Builder |
|---|---|---|

22836810

FAXED

1  Harry S. Stern, SBN 176854
2  Zachery A. Lopes, SBN 284394
   **RAINS LUCIA STERN**
3  **ST. PHALLE & SILVER, PC**
   220 Montgomery Street, 15th Floor
4  San Francisco, CA 94104
   Telephone: 415.341.9341
5  Facsimile: 925.609.1690
   Email: HStern@RLSlawyers.com
6          ZLopes@RLSlawyers.com

7  Attorneys for Petitioners

8

FILED
ALAMEDA COUNTY

AUG 12 2019

CLERK OF THE SUPERIOR COURT
By _____ DEPUTY

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                      **COUNTY OF ALAMEDA**

11

12  FRANCISCO NEGRETE, WILLIAM BERGER,    CASE NO. Rg19036n84
    BRANDON HRAIZ, CRAIG TANAKA, JOSEF
13  PHILLIPS;                              **VERIFIED PETITION FOR WRIT OF**
                                           **TRADITIONAL MANDATE; COMPLAINT FOR**
14                  Petitioners,           **DECLARATORY RELIEF**

15        v.                               [CODE CIV. PROC. §§ 1085, 1060]

16  CITY OF OAKLAND; POLICE COMMISSION OF
17  THE CITY OF OAKLAND; DOES 1 THROUGH 10,
    INCLUSIVE;
18
                    Respondents.
19

20

21        Petitioners Francisco Negrete, William Berger, Brandon Hraiz, Craig Tanaka, and Josef

22  Phillips (collectively, "Petitioners") seek a writ of traditional mandate pursuant to Code of Civil

23  Procedure section 1085, directed to and against Respondents City of Oakland, the Police Commission

24  of the City of Oakland, and Does 1 through 10 (collectively, "Respondents"), commanding them to

25  comply with the statutory procedure by which Oakland police officers are investigated for allegations

26  of workplace misconduct and disciplined as set forth in the City of Oakland's Charter and Municipal

27  Code. Petitioners also seek a judicial declaration establishing the proper application of specified

28  provisions of the City of Oakland's Charter and Municipal Code relative to the investigation and

                                            1
                    **VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE**

1   discipline of Oakland police officers.

2          On or about March 11, 2018, Petitioners responded to a concerned resident's call about a man

3   who was holding a firearm and situated between two residential buildings. Upon arriving on scene and

4   confirming that the suspect was armed with a pistol, Petitioners set a perimeter and engaged in a

5   concerted effort to disarm the suspect and bring him into custody without incident or the need for

6   force. After peacefully attempting to disarm the suspect, including multiple direct commands to "get

7   your hand off the gun," the suspect failed to comply and instead pointed the firearm towards the

8   officers, prompting Petitioners Negrete, Berger, Hraiz and Tanaka to discharge their firearms in self-

9   defense, and Petitioner Phillips to fire a non-lethal (bean bag) round in self-defense. The suspect died

10  on scene.

11         Following the incident, the Oakland Police Department ("Department") initiated both a

12  criminal investigation and administrative investigation into Petitioners' use of force. Both

13  investigations, conducted separately, concluded that Petitioners' force was lawful and within

14  Department policy. The Department's Executive Force Review Board – comprised of high-level

15  Department command officers – and the Chief of Police separately agreed that Petitioners' force was

16  lawful and within Department policy. The Office of the District Attorney of Alameda County, in its

17  separate and independent investigation, also concluded that Petitioners' force was lawful. The City of

18  Oakland's Community Police Review Agency – the investigative agency for the Police Commission of

19  the City of Oakland – also concluded that Petitioners' force was lawful and within Department policy

20  following its own independent investigation. In all, *six different investigations concluded that*

21  *Petitioners' force was lawful and within Department policy.*

22         Despite these consistent findings, the City of Oakland's Police Commission directed the Chief

23  of Police to terminate Petitioners' employment. As directed, the Chief of Police notified Petitioners

24  that the City of Oakland intended to terminate their employment. Respondents' actions are unlawful

25  for two reasons.

26         First, the Police Commission does not have jurisdiction to determine discipline in this case.

27  Pursuant to the City of Oakland's Charter and Municipal Code, the Police Commission may only direct

28  disciplinary action where its investigative agency (Community Police Review Agency) and the Chief

2

1   of Police disagree as to the investigatory findings or proposed discipline. In this case, however, both

2   the Police Commission's investigative agency and the Chief of Police agreed that Petitioners' force

3   was lawful and within Department policy, and therefore no misconduct occurred. Second, even if the

4   Police Commission had lawful jurisdiction, pursuant to the City of Oakland's Charter and Municipal

5   Code, the Police Commission's disciplinary determination must be based *solely* on the record

6   presented by its investigative agency and the Chief of Police. In this case, the Police Commission

7   explicitly relied on information other than that presented by its investigative agency and the Chief of

8   Police.

9          Respondents' notified intent to terminate Petitioners' employment violates the City of

10   Oakland's Charter and Municipal Code. Petitioners are entitled to a final determination that their use of

11   force was lawful and within Department policy.

12          Petitioners allege as follows:

13                                             **PARTIES**

14          1.     Petitioner Francisco Negrete is currently employed as a permanent non-probationary

15   Police Sergeant by the City of Oakland, and is a peace officer pursuant to Penal Code section 830.1.

16   He has been employed as a peace officer for approximately eleven years.

17          2.     Petitioner William Berger is currently employed as a permanent non-probationary

18   Police Officer by the City of Oakland, and is a peace officer as defined by Penal Code section 830.1.

19   He has been employed in this capacity for approximately five years.

20          3.     Petitioner Brandon Hraiz is currently employed as a permanent non-probationary Police

21   Officer by the City of Oakland, and is a peace officer as defined by Penal Code section 830.1. He has

22   been employed in this capacity for approximately five years.

23          4.     Petitioner Craig Tanaka is currently employed as a permanent non-probationary Police

24   Officer by the City of Oakland, and is a peace officer as defined by Penal Code section 830.1. He has

25   been employed in this capacity for approximately four years.

26          5.     Petitioner Josef Phillips is currently employed as a permanent non-probationary Police

27   Officer by the City of Oakland, and is a peace officer as defined by Penal Code section 830.1. He has

28   been employed in this capacity for approximately four years.

1    6.    Respondent City of Oakland ("City") is a political subdivision of the State of California

2    duly constituted and operating as a charter city pursuant to Article XI, Sections 3, 5, 6 and 7 of the

3    Constitution of the State of California.

4    7.    Respondent Police Commission of the City of Oakland ("Commission") is a subdivision

5    of the City governed by and operating pursuant to Section 604 of the Charter of the City of Oakland

6    ("Charter") and Chapters 2.45 and 2.46 of the City's Municipal Code.

7    8.    Respondents designated Does 1 through 10, inclusive, are presently unknown to

8    Petitioners and are sued under such fictitious names. Each Respondent designated Doe was an agent,

9    servant or employee of the City and/or Commission, and in doing the things hereinafter alleged, were

10   acting within the scope of their authority with the permission and consent of the City and Commission.

11   Each Respondent designated doe is responsible in some manner for the actions alleged herein and is

12   subject to the relief and orders requested by Petitioners.  Petitioners will amend this Petition to allege

13   the true names and capacities of Does 1 through 10 when ascertained.

14                              **GENERAL ALLEGATIONS**

15                   ARTICLE XI OF THE CONSTITUTION OF THE STATE OF CALIFORNIA

16   9.    At all times relevant, Article XI, Section 3(a) of the Constitution of the State of

17   California provided in pertinent part that the provisions of an adopted city charter "are the law of the

18   State and have the force and effect of legislative enactments."

19   10.    At all relevant times, Article XI, Section 5(a) of the Constitution of the State of

20   California provided in pertinent part that city charters may "provide that the city governed thereunder

21   may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to

22   restrictions and limitations provided in their several charters," and that, "with respect to municipal

23   affairs" city charters "shall supersede all laws inconsistent therewith."

24   11.    At all times relevant, Article XI, Section 5(b) of the Constitution of the State of

25   California provided in pertinent part that city charters may provide for "the constitution, regulation,

26   and government of the city police force," and that "plenary authority is hereby granted, subject only to

27   the restrictions of [Article XI], to provide therein or by amendment thereto, the manner in which, the

28   method by which, the times at which, and the terms for which the several municipal officers and

1   employees whose compensation is paid by the city shall be elected or appointed, and for their removal,

2   and for their compensation, and for the number of deputies, clerks and other employees that each shall

3   have, and for the compensation, method of appointment, qualifications, tenure of office and removal of

4   such deputies, clerks and other employees."

5         12.    At all times relevant, Article XI, Section 6 of the Constitution of the State of California

6   provided that "all cities [] may consolidate as a charter city [] as provided by statute."

7         13.    At all times relevant, Article XI, Section 7 of the Constitution of the State of California

8   provided that cities "may make and enforce within its limits all local, police, sanitary, and other

9   ordinances and regulations not in conflict with general laws."

10                            CITY CHARTER AND MUNICIPAL CODE

11         14.    At all times relevant, Article I, Section 106 "General Powers" of the Charter provided:

12

13           The City shall have the right and power to make and enforce all laws and
regulations in respect to municipal affairs, subject only to the restrictions

14           and limitations provided in this Charter; provided, that nothing herein
shall be construed to prevent or restrict the City from exercising or

15           consenting to, and the City is hereby authorized to exercise, any and all
the rights, powers and privileges heretofore or hereafter granted or

16           prescribed by the general laws of the State including those specifically
applicable to general law cities; provided, also, that where the general

17           laws of the State provide a procedure for the carrying out and the
enforcement of any rights or powers belonging to the City, said

18           procedure shall control and be followed unless a different procedure

19           shall have been provided in the Charter or by ordinance.

20           It is the intention of the people in adopting this section to take advantage
of the provisions of Section 6 of Article XI of the Constitution of the

21           State of California giving cities Home Rule as to municipal affairs.

22

23         15.    At all times relevant, Article 5, Section 503 "Powers of Appointment and Removal" of

24   the Charter provided:

25

26           The City Administrator shall be responsible to the Council for the proper
and efficient administration of all affairs of the City under his

27           jurisdiction, and shall, subject to the provisions of Article IX of this
Charter and except as otherwise provided in this Charter, have the power

28           to appoint, assign, reassign, discipline and remove all directors or heads

1    of departments and all employees under his jurisdiction. He may
2    delegate to directors or other department heads responsible to him/her
     the authority to appoint, discipline and remove subordinate employees,
3    subject to the provisions of Article IX of this Charter.

4    16.    In November of 2016, City residents passed a Charter amendment entitled "Measure

5    LL." Broadly, Measure LL amended the Charter by adding a new provision – Section 604 "Police

6    Commission" – establishing the Commission, the Community Police Review Agency ("Agency"), and

7    setting forth a detailed procedure for the investigation of allegations of workplace misconduct against

8    sworn members of the Department and disciplinary determinations following such investigations.

9    17.    Section 604 generally empowers the Commission to: (a) review Department policies

10   and procedures governing use of force, profiling and general assemblies, and propose changes for

11   submission to the City Council for approval or rejection, (b) review and comment on other Department

12   policies and procedures, (c) conduct public hearings on Department policies and procedures, (d)

13   review the Mayor's proposed Department budget, (e) require the Chief of Police to submit annual

14   reports for review, (f) oversee the Agency, and (g) act separately or jointly with the Mayor to remove

15   the Chief of Police under specified conditions.

16   18.    Section 604 generally empowers the Agency, as the Commission's investigative body,

17   to investigate public complaints alleging misconduct by sworn members of the Department. Upon

18   completion of an investigation, the Agency is required to issue written findings and proposed

19   discipline to the Commission and the Chief of Police.

20   19.    Section 604 also empowers the Chief of Police to investigate the conduct of Department

21   sworn employees, by stating that "[n]othing herein shall prohibit the Chief of Police or a commanding

22   officer from investigating the conduct of a Department sworn employee under his or her command…."

23   20.    For final disciplinary determinations, Section 604 sets forth a bifurcated process. If the

24   Chief of Police and Agency are in agreement as to the investigatory findings and proposed discipline,

25   the process is complete, and the Chief of Police notifies the subject sworn member(s) of the

26   disposition. If discipline is imposed, the sworn member is then entitled to invoke pre- and post-

27   deprivation due process and administrative appeal rights to contest that discipline. If, on the other

28   hand, the Chief of Police and Agency are in disagreement as to the investigatory findings and/or

proposed discipline, the matter is submitted to a "Discipline Committee" ("Committee") comprised of three members of the Commission. The Committee is then tasked with resolving the dispute and delivering its determination to the Chief of Police to notify the subject sworn member(s) and commence the administrative process if discipline is imposed.

21.     Section 604(g)(1) states "[i]f the Chief of Police agrees with the Agency's findings and proposed discipline, he or she shall send to the subject officer notification of findings and intent to impose discipline." Section 604(g)(2) states "[i]f the Chief of Police disagrees with the Agency's findings and/or proposed discipline, the Chief of Police shall prepare his or her own findings and/or proposed discipline which shall be submitted to a Discipline Committee comprised of three Commissioners … The Agency's findings and proposed discipline shall also be submitted to the Discipline Committee *which shall review both submissions and resolve any dispute between the Agency and the Chief of Police*." (Emphasis added.)

22.     The Committee's determination must be based solely on the record presented by the Chief of Police and the Agency. The Committee does not have the authority to conduct its own investigation.

23.     In or around July 2018, the City Council adopted Ordinance No. 13498, enacting two new chapters – Title II, Chapter 2.45 "Oakland Police Commission" and Chapter 2.46 "Community Police Review Agency" – of the City's Municipal Code to implement the terms of Section 604.

24.     Chapters 2.45 and 2.46 largely replicate the investigatory and discipline determination provisions of Charter Section 604. Specifically, it restates the bifurcated process by which investigative findings and disciplinary determinations are made – either by agreement between the Chief of Police and Agency, or determination by the Committee where the Chief of Police and Agency disagree.

25.     Chapter 2.45.130 states directly that "*Discipline Committees shall decide any dispute between the Agency and the Chief* regarding the proposed or final findings or proposed or final level of discipline to be imposed on a subject officer." (Emphasis added.)

26.     Chapter 2.45.140(C) states that "[a]fter the investigation of a complaint has been completed and a decision has been made regarding the proposed findings and the proposed level of

7

1    discipline [], *either by agreement between the Chief and the Agency or by decision of the Discipline*

2    *Committee*, the Chief shall send a notice of intent to impose discipline or a notice of intent to terminate

3    to the subject officer." (Emphasis added.)

4        27.    After the required notices of intent to impose discipline have been provided to the

5    subject sworn member, Chapter 2.45.140 sets forth the pre-disciplinary administrative "Skelly" process

6    pursuant to *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194. Specifically, Chapter 2.45.140 states

7    that the "Skelly report" completed after a Skelly hearing "shall be submitted to the Chief and to the

8    Agency Director if the Chief and Agency Director agreed on the Proposed Discipline," to come to a

9    final disciplinary decision. If the Chief and Agency Director cannot agree, then the Committee is

10   tasked with reviewing the Skelly report and determining final discipline. If, however, the Committee

11   decided the proposed discipline, then it receives the Skelly report directly.

12       28.    Chapter 2.45.140(F) states that "[a]fter final discipline has been determined by *either*

13   *the agreement of the Agency Director and the Chief, or by the Discipline Committee* [] the

14   complainants(s) shall be informed of the disposition of the complaint." (Emphasis added.)

15       29.    Chapter 2.45 defines the term "Chief" as "Chief of Police of the Oakland Police

16   Department."

17       30.    Chapter 2.45 also reaffirms the Commission's authority to remove the Chief of Police

18   under specified conditions, annually review the performance of the Chief of Police, and direct the

19   preparation of the Chief of Police's annual report to the Commission.

20   <u>MARCH 2018 OFFICER INVOLVED SHOOTING AND SUBSEQUENT INVESTIGATIONS</u>

21       31.    On or about March 11, 2018, Petitioners were dispatched to a scene involving a suspect

22   armed with a pistol. The incident culminated in Petitioners Negrete, Berger, Hraiz and Tanaka

23   discharging their firearms ("OIS"), resulting in the death of the armed suspect. Petitioner Phillips

24   discharged a non-lethal projectile (bean bag) round.

25       32.    In response to the OIS, the Department immediately commenced both an administrative

26   investigation through its Internal Affairs Division ("IAD"), and a separate criminal investigation

27   through its Criminal Investigations Division ("CID") into Petitioners' use of force and conduct during

28   the incident.

33.     Additionally, pursuant to Department policy, the Department convened an "Executive Force Review Board" ("EFRB") to administratively investigate and review the incident and Petitioners' use of force. The EFRB was comprised of three "voting members" – a Field Operations Deputy Chief, and two Patrol Captains. The EFRB also included seven "non-voting members" – the Department's Training Division Commander (Captain), IAD Commander (Captain), Force Investigations Commander (Lieutenant), and a technical writer, video technician, use of force coordinator, and an attorney from the City Attorney's Office. A retired United States Magistrate Judge attended the EFRB proceedings as a neutral observer.

34.     The IAD investigation of Petitioners' use of force was completed in or around October 2018. That investigation concluded that each Petitioner's use of force was objectively reasonable under the law and in compliance with Department policy. IAD concluded that each Petitioner be "exonerated" of the allegation that they used unreasonable or unlawful force.

35.     The CID Investigation of Petitioners' use of force was also completed in or around October 2018. That investigation also concluded that each Petitioner's use of force was objectively reasonable under the law.

36.     The EFRB reviewed the IAD and CID investigations, including analyzing body worn camera video of the OIS, witness statements, sworn personnel statements, and the analysis and testimony from Department-designated subject matter experts on topics such as patrol tactics, firearm deployment, and critical incident training, among others. In or around February 2019, the EFRB issued a report which unanimously concluded that each Petitioner's use of force was objectively reasonable under the law and in compliance with Department policy, and that each Petitioner was "exonerated" of the allegation that they used unreasonable or unlawful force.

37.     Also in or around February 2019, pursuant to Charter Section 604(a)(3) the Department's Chief of Police issued an addendum to the EFRB's Report following her separate review of the incident in which she agreed with the EFRB's conclusion that each Petitioner's use of force was objectively reasonable and in compliance with Department Policy, and therefore that each Petitioner was "exonerated" of the allegation that they used unreasonable or unlawful force.

/ / /

9

38.     On or about March 6, 2019, the Alameda County District Attorney's Office ("DA")
issued its own independent analysis of the OIS, also finding that the use of force was reasonable and
lawful, and therefore formally declining to pursue criminal charges against Petitioners Negrete, Berger,
Hraiz and Tanaka. Petitioner Phillips, having only discharged a non-lethal projectile, was not a subject
of the DA's investigation.

39.     On or about April 22, 2019, the Commission's investigative body – the Agency – issued
its own independent analysis of the OIS, also finding that each Petitioner's use of force was objectively
reasonable and in compliance with Department policy, and therefore that each Petitioner was
"exonerated" of the allegation that they used unreasonable or unlawful force – conforming exactly to
the findings of the Department's Chief of Police.

40.     Accordingly, six separate and independent reviews of Petitioners' use of force – IAD,
CID, EFRB, Chief of Police, DA, and Agency – unanimously concluded that each of the Petitioners'
use of force was lawful. Every City administrative review of the force used – IAD, EFRB, Chief of
Police, Agency – unanimously "exonerated" each Petitioner of the allegation that they used
unreasonable or unlawful force.

41.     Department policy defines a finding of "exoneration" to mean that "[a] preponderance
of the evidence proves that the alleged conduct occurred but that the conduct was justified, lawful, or
proper."

<u>PETITIONERS' PLACEMENT ON INVOLUNTARY ADMINISTRATIVE LEAVE</u>

42.     Despite being unanimously exonerated by every City administrative review of the OIS,
beginning on or about March 12, 2019, the Chief of Police placed each Petitioner on involuntary
administrative leave, suspended their peace officer powers, and restricted their access to Department
facilities to that of a private citizen. Each Petitioner was informed that these actions were being taken
in furtherance of the OIS investigation, without further detail.

43.     In a letter dated June 11, 2019, with Petitioners still on administrative leave, Petitioners'
counsel sent a letter to the Chief of Police demanding immediate reinstatement in light of the Charter
and Municipal Code, their unanimous exoneration by the Chief of Police and Agency of unreasonable
force allegations, and their right to be free from punitive action absent due process and the opportunity

1  of administrative appeal.

2      44.    The next day, the Chief of Police responded via email that she was "recused from this

3  matter" without further explanation. and she "should not be included in any further communication

4  regarding this OIS." The Chief of Police also stated that she had forwarded the letter to "Chief

5  Warshaw," and directed Petitioners' counsel to "reach out" to the City Attorney's Office.

6      45.    In a letter dated June 28, 2019 to the City Attorney, Petitioners' counsel again

7  demanded Petitioners' reinstatement, and attached the prior June 11, 2019 letter sent to the Chief of

8  Police. The City Attorney's Office never responded to the June 28, 2019 letter.

9                        THE COMPLIANCE DIRECTOR

10      46.    The Chief of Police's mention of "Chief Warshaw" referred to Robert Warshaw, the

11  Compliance Director appointed by the United States District Court, Northern District of California

12  ("District Court") to facilitate the City's compliance with a "Negotiated Settlement Agreement"

13  ("NSA") entered into between the City as a party defendant and plaintiffs in the matter of *Delphine*

14  *Allen, et al. v. City of Oakland, et al.*, Case No. C00-4599 ("*Allen*").

15      47.    Over sixteen years ago, in or around January 2003, the City as a party defendant settled

16  the *Allen* plaintiffs' allegations of a "pattern and practice" of civil rights violations with a monetary

17  payment and execution of the NSA. The NSA, generally, sets forth various "tasks" to be completed by

18  the Department in furtherance of establishing and maintaining constitutionally-compliant police

19  practices.

20      48.    To facilitate compliance with these tasks, the NSA established the position of

21  "Monitor" and set forth the Monitor's duties, responsibilities and authority. The NSA states that the

22  Monitor "is not intended to [] replace or take over the role or duties of the Chief of Police or other

23  police or City officials."

24      49.    The NSA also states that its terms are not "intended to alter the existing collective

25  bargaining agreement between the City and [Department] member/employee bargaining units or to

26  impair the collective bargaining rights of [Department] member/employee bargaining units under state

27  law or local law."

28  ///

<div align="center">11</div>

50.     The NSA contemplates Monitor review of Department use of force investigations, stating that should the Monitor determine that any such investigation is inadequate under the NSA, the Monitor shall confer with the Chief of Police, among other Department officials. and prepare a confidential memorandum to the Department and District Court. The Monitor's evaluation of such investigations is for the purpose of "assisting the Chief of Police on conducting future investigations, and shall not obligate the Department to reopen or re-adjudicate any investigation."

51.     In an order dated January 24, 2012 the District Court conferred additional authority on the Monitor beyond that set forth in the NSA. Specifically, the District Court directed the Department to "consult" with the Monitor on "personnel decisions," including "disciplinary actions in Class I misconduct cases" such as using lethal force in violation of Department policy. The District Court further directed a procedure to review any City decision implemented against the recommendation of the Monitor. The District Court's January 24, 2012 order states in pertinent part:

"the Court now confers additional authority on the Monitor as follows:

...effective immediately, the Chief must regularly consult with the Monitor on all major decisions that may impact compliance with the NSA, including but not limited to:

...

•       Personnel decisions, including promotions, engagement of consultants, and disciplinary actions in Class I misconduct cases;

...

If, after consultation with the Monitor, the Chief intends to take action against the Monitor's recommendation, then the Monitor shall discuss the intended action with the City Administrator and Mayor...

If the City ultimately implements a decision against the Monitor's recommendation, then the Court may schedule a hearing to determine whether it should order that the Monitor's recommendation be implemented. At any such hearing, the City will bear the burden of persuading the Court that its failure to follow the Monitor's recommendation will not have a negative impact on the City's compliance efforts.

///

12

VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE

52.    In an order dated December 12, 2012, the District Court established the position of Compliance Director, which was vested with "the same rights and privileges as have already been agreed to and/or ordered with respect to the Monitor…." In addition to having authority to remove the Chief of Police, the Compliance Director was vested with the authority to direct action by the City or Department to facilitate compliance with the NSA. The District Court's December 2012 order states in pertinent part:

> The Compliance Director will have the authority to direct specific actions by the City or OPD to attain or improve compliance levels. or remedy compliance errors, regarding all portions of the NSA and AMOU, including but not limited to: … (2) personnel decisions, including but not limited to promotions; engagement of consultants; assignments; findings and disciplinary actions in misconduct cases and use-of-force reviews; the discipline or demotion of OPD officers holding the rank of Deputy Chief and Assistant Chief; and the discipline, demotion, or removal of the Chief of Police…

53.    The additional authority relating to "findings and disciplinary actions in misconduct cases and use-of-force reviews" conferred on the Compliance Director by the District Court's December 12, 2012 Order was not part of the NSA agreed to between the *Allen* plaintiffs and the City.

54.    The District Court's December 12, 2012 order also reaffirmed that Department employees' collective bargaining rights cannot be impaired, stating in pertinent part:

> the Compliance Director's exercise of authority will be limited by the following:
> …
>
> b. Members of the OPD up to and including the rank of Captain will continue to be covered by the Meyers-Milias-Brown Act, the collective bargaining agreement, and OPOA members' rights to arbitrate and appeal disciplinary action. The Compliance Director will have no authority to abridge, modify, or rescind any portion of those rights for these members.
>
> c. The Compliance Director will have no authority to rescind or otherwise modify working conditions referenced in the labor agreements between the City and the OPOA as those contracts relate to any member up to and including the rank of Captain. "Working conditions" include the rights identified in the above subparagraph, as well as salary, hours, fringe benefits, holidays, days off, etc.

13

1      55.     In an order dated July 22, 2014, the District Court "reiterate[d]" that the Department

2 and City "will not implement any of the types of changes or actions identified in the January 24, 2012

3 order without the Compliance Director's direction or approval." The order specifically identifies such

4 "actions" as including "disciplinary actions in Class I misconduct cases." The District Court instructed

5 the City and Department that "no discipline in Class I misconduct cases can be imposed absent the

6 Compliance Director's direction or approval. If the City disagrees with the Compliance Director, it

7 must follow the dispute resolution process set forth in the December 12, 2012 order." The District

8 Court's instruction regarding the Compliance Director's "direction or approval" in misconduct cases

9 was not part of the NSA agreed to between the *Allen* plaintiffs and City.

10      56.     In the instant case, in addition to the Chief of Police, the Compliance Director also

11 issued an addendum to the EFRB's OIS Report. The Compliance Director claimed that each Petitioner

12 violated the Department's use of force policy. The addendum does not set forth any recommended

13 discipline.

14       <u>THE CITY'S NOTIFICATION OF INTENT TO TERMINATE PETITIONERS' EMPLOYMENT</u>

15      57.     Beginning on or about July 11, 2019, each Petitioner was served with a letter signed by

16 the Chief of Police asserting that the City "intends to terminate" their employment. The letters further

17 stated that the intended termination "result[ed] from the [sic] Oakland Police Commission Discipline

18 Committee and its review of" the Agency investigation of the OIS, which had determined that their

19 conduct was "out of compliance, in violation of Oakland Police Department rules, regulations, or

20 policies." The letters informed Petitioners that "[a] date and time for [their] Skelly Hearing[s] will be

21 scheduled shortly," and that they would be "notified in ample time to respond to the facts contained in

22 this letter."

23      58.     None of the Petitioners were provided any factual or analytical basis for the City's

24 decision to terminate, or how such a determination was made following their unanimous exoneration

25 of unreasonable force allegations by IAD, EFRB, Chief of Police, and AGENCY.

26      59.     Shortly thereafter, each Petitioner separately demanded Skelly materials. After a

27 requested clarification on the process by which Skelly materials would be provided, the City

28 / / /

1   Attorney's Office informed Petitioners' counsel that IAD is compiling the Skelly materials separately
2   for each client.

3        60.    In email correspondence dated July 17, 2019, in advance of waiting on IAD to complete
4   the entire Skelly packet for each Petitioner, Petitioners' counsel specifically requested to be provided
5   "any documents reflecting the bas[is] or reasons for the Police Commission's disciplinary decisions …
6   In other words, if the Commission issued an analysis, report, findings, etc., or anything similar, for
7   each individual case or the [OIS] as a whole, we're most immediately interested in reviewing that."
8   The City Attorney's Office did not respond to that specific request.

9   THE CITY'S PUBLIC DISSEMINATION OF TWO VERSIONS OF THE DISCIPLINE COMMITTEE'S "FINDINGS"

10        61.    The next day, July 18, 2019, the City publicly released the Committee's "findings" with
11   respect to its review of the OIS. Petitioners first read about the purported bases for the City's noticed
12   intent to terminate their employment in various news media, as they had still not received the
13   document itself from their employer. Nor had the City Attorney's Office responded to Petitioners'
14   counsel's request for that very document the day prior. Petitioners' counsel downloaded the
15   Committee's findings from a City website address provided by a news reporter.

16        62.    The July 18, 2019 document setting forth the Committee's findings ("Initial Committee
17   OIS Report") was identified on the City's website as "Discipline Committee Report
18   Recommendation." Its analysis of the facts of the OIS began mid-sentence at the top of page 5, despite
19   the document's sequential numbering. Ultimately, the document stated that the Committee found each
20   Petitioner's use of force was "out of compliance with [Department] policy," and concluded that
21   termination was the appropriate discipline.

22        63.    Notably, the document included an express statement of the Committee's asserted
23   jurisdiction – it claimed that the Compliance Director's review of the incident "stand[s] in the place" of
24   the Department's – thereby creating "conflicting findings and proposed discipline by [the Agency] and
25   Chief Warshaw" affording it jurisdiction to decide the matter.

26        64.    The document lists three separate reports by the Compliance Director setting forth his
27   review: (1) the February 19, 2019 addendum to the EFRB report, (2) a June 12, 2019 Memorandum Re
28   Discipline, and (3) a June 27, 2019 supplemental document to his earlier report and memorandum.

1       65.    Neither Petitioners nor their counsel have been provided a June 12, 2019

2 "Memorandum Re Discipline" or a June 27, 2019 "supplemental document." This, despite Petitioners'

3 counsel's June 11, 2019 letter to the Chief of Police which she forwarded to the Compliance Director

4 that same day, and June 28, 2019 letter to the City Attorney's Office.

5       66.    On July 25, 2019, the City Attorney's Office informed Petitioners' counsel that a

6 "revised" document setting forth the Committee's findings was released ("Revised Committee OIS

7 Report"), and provided a link to the City's website. This document was identified on the City's website

8 as "OPC – Discipline Committee Memo." The findings and disciplinary decision for each Petitioner

9 remains the same in the revised document.

10       67.    Petitioners remain in administrative leave status, and as of the filing of this Petition,

11 have not received the requested Skelly materials and Skelly Hearing dates have not been set.

<p style="text-align:center"><strong>TRADITIONAL MANDATE</strong></p>

<p style="text-align:center">Code of Civil Procedure § 1085</p>

14       68.    Petitioners reallege and incorporate paragraphs 1 through 67 as though fully set forth

15 herein.

16       69.    Pursuant to the express terms of Section 604 of the Charter, Committees may only be

17 established to make disciplinary determinations for Department sworn personnel where the Chief of

18 Police and Agency are in disagreement as to investigatory findings or proposed discipline. If the Chief

19 of Police agrees and the Agency agree on the findings and proposed discipline, the Chief of Police is

20 vested with final decision-making authority and the Committee does not have jurisdiction.

21       70.    Pursuant to the express terms of Title II, Chapter 2.45 "Police Commission" of the

22 Municipal Code, Committees may only be established to make disciplinary determinations for

23 Department sworn personnel where the Chief of Police and Agency are in disagreement as to

24 investigatory findings or proposed discipline. Chapter 2.45.130 states directly that "Discipline

25 Committees *shall decide any dispute between the Agency and the Chief* regarding the proposed or final

26 findings or proposed or final level of discipline to be imposed on a subject officer."

27       71.    Chapter 2.45.140(C) states that "[a]fter the investigation of a complaint has been

28 completed and a decision has been made regarding the proposed findings and the proposed level of

<p style="text-align:center">16</p>

1   discipline [], *either by agreement between the Chief and the Agency or by decision of the Discipline*

2   *Committee*, the Chief shall send a notice of intent to impose discipline or a notice of intent to terminate

3   to the subject officer." (Emphasis added.) Chapter 2.45.140(F) states that "[a]fter final discipline has

4   been determined by *either the agreement of the Agency Director and the Chief, or by the Discipline*

5   *Committee* [] the complainants(s) shall be informed of the disposition of the complaint." (Emphasis

6   added.)

7        72.    The Committee's reliance on the Compliance Director's review of Petitioners' conduct

8   during the OIS violates the Charter and Municipal Code. Pursuant to Section 604 of the Charter and

9   Chapter 2.45 of the Municipal Code, the Chief of Police means the "Chief of Police of the Oakland

10  Police Department." Neither the Charter nor Chapter 2.45 or 2.46 of the Municipal Code grant any

11  authority to, or mention, the Compliance Director appointed in the *Allen* litigation to facilitate

12  compliance with a settlement agreement between two litigants. Moreover, even where properly

13  constituted, the Committee's determination must be based solely on the record presented by the Chief

14  of Police and Agency.

15       73.    Neither the City nor the Commission were directed by the Compliance Director to take

16  any specific disciplinary action relative to Petitioners' conduct during the OIS.

17       74.    As set forth above, the Chief of Police and Agency were in agreement that Petitioners

18  are "exonerated" of the allegation that they used unlawful or non-compliant force during the OIS. Both

19  the Chief of Police and Agency agreed that such force was lawful and within Department policy.

20  Accordingly, pursuant to Section 604 of the Charter and Chapter 2.45 of the Municipal Code,

21  Petitioners have been formally exonerated and the Committee does not have jurisdiction or authority to

22  impose disciplinary action.

23       75.    Respondents have a clear, present, and ministerial duty to comply with Section 604 of

24  the Charter and Chapters 2.45 and 2.46 of the Municipal Code. Respondents also have a clear, present,

25  and ministerial duty to comply with Article XI, Sections 3, 5, and 7 of the Constitution of the State of

26  California. The Charter represents the supreme law of the City, subject only to conflicting provisions

27  in the federal and state constitutions and to preemptive state law.

28  ///

76.     Respondents have at all times been able to comply, and at all times will be able to comply, with its legal obligation to abide by Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code. Petitioners have demanded that Respondents so comply, and they have refused. There are no conflicting provisions in the federal or state constitutions or preemptive state law preventing Respondents' compliance.

77.     Petitioners are beneficially interested in the issuance of a writ of mandate commanding Respondents to comply with their ministerial obligations under Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code. Pursuant to these governing provisions, Petitioners have been exonerated of all unreasonable or unlawful force allegations arising from their conduct during the OIS in accordance with the Charter and Municipal Code. Petitioners have a well-established right to ensure that Respondents strictly follow the statutory procedures governing the imposition of disciplinary action.

78.     Petitioners have suffered, and will continue to suffer, great and irreparable harm as a result of Respondents' failure and refusal to comply with its ministerial obligations under Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code.

79.     Petitioners have no plain, speedy, or adequate remedy in the ordinary course of law, other than the relief sought herein, in that monetary damages are inadequate to compensate for Respondents' refusal to comply with their ministerial obligations under Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code.

80.     Petitioners are not required to exhaust any administrative remedies prior to initiating this legal action.

## DECLARATORY RELIEF

### Code of Civil Procedure § 1060

81.     Petitioners re-allege paragraphs 1 through 80 as though fully set forth herein.

82.     An actual and justiciable controversy has arisen, and now exists, between Petitioners and Respondents as to whether: (a) the Committee may assert jurisdiction to determine disciplinary action on Department sworn personnel based on a disagreement between the Compliance Director's and Agency's findings and proposed discipline, (b) the Compliance Director's findings and proposed

1  discipline "stand[] in the place of" the Chief of Police's findings and proposed discipline, and (c) the

2  Committee has authority to make a disciplinary determination based on review of material from

3  outside of the record presented by the Chief of Police and Agency.

4         83.     This controversy is a proper subject for declaratory relief because the parties are in

5  fundamental disagreement over the proper application of the statutory procedures set forth in Section

6  604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code.

7         84.     There are no effective administrative remedies available to Petitioners to compel the

8  relief sought herein.

9        WHEREFORE, Petitioners pray for the relief set forth below.

10                          **PRAYER**

11        Petitioners respectfully request that the court enter judgment in their favor and against the City,

12  Commission, Does 1 through 10, inclusive, their committees, agents, employees and anyone or any

13  entity acting on their behalf as follows:

14         1.     For a peremptory writ of mandate commanding Respondents to comply immediately

15  with Section 604 of the Charter and Chapters 2.45 and 2.46 of the Municipal Code, by formally

16  exonerating each Petitioner of misconduct allegations relative to their use of force during the OIS;

17         2.     For appropriate injunctive relief restraining Respondents from maintaining or imposing

18  any disciplinary action on Petitioners arising from their use of force during the OIS;

19         3.     For a judicial declaration establishing that: (a) the Committee may not assert

20  jurisdiction to determine disciplinary action on Department sworn personnel based on a disagreement

21  between the Compliance Director's and Agency's findings and proposed discipline, (b) the

22  Compliance Director's findings and proposed discipline do not "stand[] in the place of" the Chief of

23  Police's findings and proposed discipline for investigations of alleged misconduct of Department

24  sworn personnel, and (c) the Committee does not have authority to review material from outside the

25  record presented by the Chief of Police and Agency when making a disciplinary determination;

26         4.     For an award of attorney fees as otherwise authorized by law;

27         5.     For an award of costs of suit incurred in this action; and

28  / / /

VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE

1    6.    For such other and further relief as the court deems just and proper.

2

3  Dated: August 12, 2019                    Respectfully submitted,

4                                            RAINS LUCIA STERN
                                             ST. PHALLE & SILVER, PC
5

6                                            By: _____

7                                                 Zachery A. Lopes
                                                  Attorneys for Petitioners
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED PETITION FOR WRIT OF TRADITIONAL MANDATE

22836705

**FAXED**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
HARRY S. STERN (SBN 176854)
RAINS LUCIA STERN et al.
2300 CONTRA COSTA BLVD., #500
PLEASANT HILL, CA 94523
TELEPHONE NO.: (925) 609-1699      FAX NO. *(Optional)*: (925) 905-9250
E-MAIL ADDRESS *(Optional)*:
ATTORNEY FOR *(Name)*: FRANCISCO NEGRETE, WILLIAM BERGER, BRANDON HRAIZ, CRAIG TANAKA, JOSEF PHILLIPS

FOR COURT USE ONLY

**FILED**
ALAMEDA COUNTY

AUG 16 2019

CLERK OF THE SUPERIOR COURT
By _Tania_
Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 FALLON STREET
MAILING ADDRESS: SAME AS ABOVE
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: ALAMEDA SUPERIOR COURT

PLAINTIFF/PETITIONER: FRANCISCO NEGRETE, WILLIAM BERGER, BRANDON HRAIZ, CRAIG TANAKA, JOSEF PHILLIPS,

DEFENDANT/RESPONDENT: CITY OF OAKLAND, et al.

CASE NUMBER:
RG19030784

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.:
RAILUPH-0004483.MB

*(Separate proof of service is required for each party served.)*

1.  At the time of service I was at least 18 years of age and not a party to this action.
2.  I served copies of:
    a.  [✓] Summons
    b.  [✓] Verified Petition for Writ of Traditional Mandate; Complaint for Declaratory Relief
    c.  [✓] Alternative Dispute Resolution (ADR) package
    d.  [ ] Civil Case Cover Sheet
    e.  [ ] Cross-Complaint
    f.  [ ] Other *(specify documents)*:

3.  a.  Party served *(specify name of party as shown on documents served)*:
    POLICE COMMISSION OF THE CITY OF OAKLAND

    b.  [✓] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
    NIKKI LA, PUBLIC SERVICE REP, AUTHORIZED TO ACCEPT

4.  Address where the party was served: 1 FRANK H OGAWA PLAZA, 6TH FLOOR , OAKLAND , CA 94612

5.  I served the party *(check proper box)*
    a.  [✓] **by personal service.** I personally delivered the documents listed item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: 08/13/2019     (2) at *(time)*: 2:03pm
    b.  [ ] **by substituted service.** On *(date)*:            at *(time)*:            I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

        (1)  [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

        (2)  [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

        (3)  [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

        (4)  [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ.Proc., § 415.20). I mailed the documents on *(date)*:            from *(city)*:            or [ ] a declaration of mailing is attached.

        (5)  [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| PLAINTIFF/PETITIONER: FRANCISCO NEGRETE, WILLIAM BERGER, BRANDON HRAIZ, CRAIG TANAKA, JOSEF PHILLIPS, | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: CITY OF OAKLAND, et al. | RG19030784 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date)*:        (2) from *(city)*:

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgment of Receipt).* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested.   (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section):*

     ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. ☐ as an individual defendant.
  b. ☐ as the person sued under the fictitious name of *(specify):*
  c. ☐ as occupant.
  d. ☑ On behalf of *(specify):*   POLICE COMMISSION OF THE CITY OF OAKLAND
     under the following Code of Civil Procedure section:

     ☐ 416.10 (corporation)         ☐ 415.95 (business organization, form unknown)
     ☐ 416.20 (defunct corporation)       ☐ 416.60 (minor)
     ☐ 416.30 (joint stock company/association).  ☐ 416.70 (ward or conservatee)
     ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
     ☑ 416.50 (public entity)            ☐ 415.46 (occupant)
                           ☐ other:

7. **Person who served papers**
  a. Name: RAUL DELEON
  b. Address: PO Box 861057, Los Angeles, California 90086
  c. Telephone number: (213) 975-9850
  d. **The fee for service was:** $
  e. **I am:**
    (1) ☐ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☑ registered California process server:
       (i) ☐ owner ☐ employee ☑ independent contractor.
       (ii) Registration No.:1202
       (iii) County: SANTA CLARA

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    **or**

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 8/14/2019

RAUL DELEON
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)   ▶                        (SIGNATURE )

Rains, Lucia, & Wilkinson LLP
Attn: Stern, Harry S
220 Montomery Street
15th Floor
San Francisco, CA   94104____

City of Oakland

# Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Negrete | No. <u>RG19030784</u> |
| Plaintiff/Petitioner(s) | |
| VS. | |
| City of Oakland | NOTICE OF HEARING |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above entitled action has been set for:

Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Case Management Conference:
DATE: 11/01/2019   TIME:  09:00 AM   DEPARTMENT:  17
LOCATION:  Administration Building, Third Floor
           1221 Oak Street, Oakland

Dated:  08/16/2019          Chad Finke  Executive Officer / Clerk of the Superior Court

By _____
                                        Deputy Clerk

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 08/19/2019.

By _____
                                        Deputy Clerk

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DELPHINE ALLEN, et al.,

               Plaintiffs,

v.

CITY OF OAKLAND, et al.,

               Defendants.

MASTER CASE FILE
NO. C00-4599 TEH

ORDER RE: COMPLIANCE
DIRECTOR

Nearly ten years after the parties agreed to a consent decree that was to have been completed in five years but that remains incomplete, the Court was scheduled to hear Plaintiffs' motion to appoint a receiver. After reviewing Defendants' opposition to Plaintiffs' motion, it became clear that Defendants did not dispute many of the issues raised by Plaintiffs, including Plaintiffs' conclusion that Defendants would be unable to achieve compliance without further intervention by this Court. The Court ordered the parties to meet and confer to attempt to reach agreement on how this case should proceed and, following the parties' request, referred this case to a magistrate judge for settlement.

Magistrate Judge Nathanael Cousins held a series of in-person and telephonic settlement conferences that culminated in the filing of a jointly proposed order on December 5, 2012. The parties were able to reach an agreement for additional oversight by a Court appointee who will have directive authority over Defendants relevant to the Negotiated Settlement Agreement ("NSA") and Amended Memorandum of Understanding ("AMOU").[1] The Court now approves the parties' agreement as modified below and therefore VACATES the hearing scheduled for December 13, 2012.

---

[1]The NSA and AMOU were entered as orders of this Court on January 22, 2003, and June 27, 2011, respectively.

IT IS HEREBY ORDERED that:

**A.     Appointment of a Compliance Director**

1.     The Court will appoint a Compliance Director whose mission will be to bring Defendants into sustainable compliance with the NSA and AMOU.  As the Court's agent, the Compliance Director will report directly to the Court and will not act as the agent of any party to this action or any other entity or individual.

2.     The Compliance Director will have the same rights and privileges as have already been agreed to and/or ordered with respect to the Monitor, including those relating to testifying in this or other matters, confidentiality, and access to information and personnel. Likewise, the Compliance Director shall not be retained by any current or future litigant or claimant in a claim or suit against the City and its employees.

3.     The parties will meet and confer and attempt to make a joint recommendation to the Court regarding the selection of the Compliance Director.  If they are not able to agree, the parties will each recommend candidate(s) to the Court for consideration.  The parties' recommendations, including descriptions of the candidates' qualifications for the position, shall be filed under seal on or before **December 21, 2012**.  The selection of the Compliance Director rests solely within the Court's discretion, and the Court will not be limited to the parties' recommendations, whether separate or joint.

4.     The Compliance Director will be a full-time position based in Oakland for a minimum of one year and at least until Defendants have achieved full compliance with the NSA and AMOU.  The Compliance Director will serve until this case is terminated or until otherwise ordered by the Court.  Any party may petition the Court to remove the Compliance Director for good cause.

5.     The City will pay the costs of the Compliance Director and all costs related to the Compliance Director's work, including the cost of providing commensurate support services and office space.  The Compliance Director's salary will be established by the Court upon appointment, and the Compliance Director will receive benefits commensurate with

United States District Court

For the Northern District of California

comparable City officials, such as the City Administrator and Chief of Police. The Court expects the City to reach a prompt compensation agreement with the Compliance Director upon appointment. If an agreement or any payment is unduly delayed, the Court will order the City to pay the Compliance Director, as well as the Monitor, through the Court's registry.

6.      The AMOU will remain in effect except to the extent it conflicts with this order. This includes the requirement that a task will not be removed from active monitoring until Defendants have demonstrated substantial compliance for at least one year.

**B.      Role of the Monitor Upon Appointment of the Compliance Director**

1.      The requirement in the January 24, 2012 order for consultation with the Monitor will terminate upon appointment of the Compliance Director. However, Defendants will not implement any of the types of changes or actions identified in the January 24, 2012 order without the Compliance Director's direction or approval.

2.      Unless otherwise ordered, the Monitor's duties and responsibilities will otherwise remain unchanged and will stay in effect until this case is terminated. These duties include the continuation of the Monitor's quarterly reports, drafts of which will be provided simultaneously to the Compliance Director and the parties.

3.      The Monitor and the City shall meet and confer concerning compensation to be paid to the Monitor for work performed after the current AMOU termination date of January 22, 2014. If they cannot reach agreement, the matter will be resolved by the Court. If any payment is unduly delayed, the Court will order the City to pay the Monitor, as well as the Compliance Director, through the Court's registry.

4.      The Compliance Director and the Monitor will be independent positions that report only to the Court and not to each other. However, the Court expects the Compliance Director and the Monitor to work closely and in consultation with each other. Thus, for example, any technical assistance or informal advice provided by the Monitor to Defendants should include the Compliance Director whenever possible, and the Compliance Director should consult with the Monitor on all major decisions.

3

## C.     Duties of the Compliance Director

1.     Within 30 days of his or her appointment, the Compliance Director will file a remedial action plan ("Plan") that both addresses deficiencies that led to noncompliance and explains how the Plan will facilitate sustainable compliance with all outstanding tasks by December 2013 or as soon thereafter as possible.  In developing the plan, the Compliance Director will consult with the Monitor, Plaintiffs, the Mayor, the City Administrator, the Chief of Police, and the Oakland Police Officers' Association ("OPOA").  The Compliance Director will work closely and communicate regularly with the Chief of Police, the Chief's staff, and other relevant City personnel to implement the Plan.  The Plan will include:

a.     A proposed budget, to be included as part of the Oakland Police Department ("OPD") budget, that is mutually agreed to by the Compliance Director, the Mayor, the City Administrator, and the Chief of Police for the fiscal year based on proposed expenditures for task compliance.

b.     A plan for the oversight, acquisition, and implementation of a personnel assessment system ("IPAS") that provides a sustainable early-warning system that will mitigate risk by identifying problems and trends at an early stage.  The Compliance Director will ensure that all parties are fully informed about both the procurement of new technology and how that technology will be used to identify problems and trends to ensure that officers are provided the requisite assistance at the earliest possible stage.

c.     Strategies to ensure that allegations made by citizens against the OPD are thoroughly and fairly investigated.

d.     Strategies to decrease the number of police misconduct complaints, claims, and lawsuits.

e.     Strategies to reduce the number of internal affairs investigations where improper findings are made.  This includes strategies to ensure that investigators apply the correct burden of proof, as well as strategies to ensure that complaints are not disposed of as "unfounded" or "not sustained" when sufficient evidence exists to support that the alleged conduct did occur.

United States District Court

For the Northern District of California

1           f.    A list of persons responsible for each outstanding task or specific action

2  item. This requirement shall supersede the requirement for Defendants to file updated lists of

3  persons responsible with the Court.

4         The above list of requirements is not exhaustive. Likewise, the parties have agreed

5  that tasks related to the following areas are key to driving the sustained cultural change

6  envisioned by the parties when agreeing to the NSA and AMOU: collection of stop data, use

7  of force, IPAS, sound management practices, and the quality of investigations by the Internal

8  Affairs Division. These areas are covered by Tasks 5, 20, 24, 25, 26, 30, 34, 40, and 41. The

9  Court agrees that the identified tasks are of utmost importance but, unless otherwise ordered,

10  expects full and sustainable compliance with all NSA tasks.

11        2.    Within 60 days of his or her appointment, the Compliance Director will file a list

12  of benchmarks for the OPD to address, resolve, and reduce: (1) incidents involving the

13  unjustified use of force, including those involving the drawing and pointing of a firearm at a

14  person or an officer-involved shooting; (2) incidents of racial profiling and bias-based

15  policing; (3) citizen complaints; and (4) high-speed pursuits. In developing these

16  benchmarks, the Compliance Director will consult with the Monitor, Plaintiffs, the Mayor,

17  the City Administrator, the Chief of Police, the OPOA, and, as necessary, subject-matter

18  experts to ensure that the benchmarks are consistent with generally accepted police practices

19  and national law enforcement standards.

20        3.    Beginning on May 15, 2013, and by the 15th of each month thereafter, the

21  Compliance Director will file a monthly status report that will include any substantive

22  changes to the Plan, including changes to persons responsible for specific tasks or action

23  items, and the reasons for those changes. The monthly status reports will also discuss

24  progress toward achieving the benchmarks, reasons for any delayed progress, any corrective

25  action taken by the Compliance Director to address inadequate progress, and any other

26  matters deemed relevant by the Compliance Director. These monthly reports will take the

27  place of Defendants' biweekly reports, which shall be discontinued after May 15, 2013.

28

United States District Court
For the Northern District of California

4. Prior to filing any documents with the Court, the Compliance Director will give the parties an opportunity to determine whether any portions of the documents should be filed under seal. Requests to file documents under seal must be narrowly tailored and made in accordance with Civil Local Rule 79-5.

5. The Compliance Director may, at his or her sole discretion, develop a corrective action plan for any task for which the Monitor finds Defendants to be out of compliance. As part of any such plan, the Compliance Director will determine the nature and frequency of future internal compliance testing for that task.

6. The Compliance Director will have the power to review, investigate, and take corrective action regarding OPD policies, procedures, and practices that are related to the objectives of the NSA and AMOU, even if such policies, procedures, or practices do not fall squarely within any specific NSA task.

7. The Compliance Director will have the authority to direct specific actions by the City or OPD to attain or improve compliance levels, or remedy compliance errors, regarding all portions of the NSA and AMOU, including but not limited to: (1) changes to policies, the manual of rules, or standard operating procedures or practices; (2) personnel decisions, including but not limited to promotions; engagement of consultants; assignments; findings and disciplinary actions in misconduct cases and use-of-force reviews; the discipline or demotion of OPD officers holding the rank of Deputy Chief and Assistant Chief; and the discipline, demotion, or removal of the Chief of Police; (3) tactical initiatives that may have a direct or indirect impact on the NSA or AMOU; (4) procurement of equipment, including software, or other resources intended for the purpose of NSA and AMOU compliance; and (5) OPD programs or initiatives related to NSA tasks or objectives. The Compliance Director will have the authority to direct the City Administrator as it pertains to outstanding tasks and other issues related to compliance and the overall NSA and AMOU objectives. Unless otherwise ordered, the Compliance Director's exercise of authority will be limited by the following:

a.  The Compliance Director will have expenditure authority up to and including $250,000 for expenditures included in the Plan.  This is not a cumulative limit.  For individual expenditures greater than $250,000, the Compliance Director must comply with public expenditure rules and regulations, including Oakland Municipal Code article I, chapter 2.04.  The City Administrator will seek authorization of these expenditures under expedited public procurement processes.  The Compliance Director may seek an order from this Court if he or she experiences unreasonable funding delays.

b.  Members of OPD up to and including the rank of Captain will continue to be covered by the Meyers-Milias-Brown Act, the collective bargaining agreement, and OPOA members' rights to arbitrate and appeal disciplinary action.  The Compliance Director will have no authority to abridge, modify, or rescind any portion of those rights for these members.

c.  The Compliance Director will have no authority to rescind or otherwise modify working conditions referenced in the labor agreements between the City and the OPOA as those contracts relate to any member up to and including the rank of Captain.  "Working conditions" include the rights identified in the above subparagraph, as well as salary, hours, fringe benefits, holidays, days off, etc.

d.  Prior to removing the Chief of Police or disciplining or demoting the Chief of Police, an Assistant Chief, or a Deputy Chief, the Compliance Director will first provide written notice, including reasons for the intended action, to the parties and the affected individual and an opportunity for appeal to this Court.  Where practicable, the Compliance Director will consult with the Mayor, the City Administrator, and the Chief of Police prior to providing such notice.[2]  Within seven calendar days of the Compliance Director's written notice, the City, Plaintiffs, and the affected Chief, Assistant Chief, or Deputy Chief may oppose or support any such action, under applicable federal and state law, by filing a notice with the Court seeking an expedited briefing schedule and hearing.  The affected Chief,

[2]Prior consultation may not always be practicable.  For example, the Compliance Director will not be expected to consult with the Chief of Police on a decision to discipline, demote, or remove the Chief of Police.

7

Assistant Chief, or Deputy Chief will retain his or her employment and other rights pending the Court's decision.

        e.   In all disputes between the City and the Compliance Director relating to this order, except for the demotion, discipline, and removal decisions covered in the preceding subparagraph, the Compliance Director will consult with the Mayor, the City Administrator, the Chief of Police, and Plaintiffs in hopes of reaching consensus.  If, after such consultation, the City and the Compliance Director remain in disagreement, the Compliance Director will provide written notice to the parties of the dispute and the Compliance Director's proposed direction.  Within seven calendar days of the Compliance Director's written notice, the City may file a notice with the Court seeking an expedited hearing to determine whether the City should be excused from complying with the Compliance Director's direction.  The City will comply with any direction that is not timely brought before the Court.  The City's right to seek relief from the Court must not be abused and should generally be limited to matters related to employee discipline or expenditures in excess of $250,000.  At any hearing on a disputed issue, the City will bear the burden of persuading the Court that the City's failure to follow the Compliance Director's direction will not harm the City's compliance with the NSA or AMOU.  Plaintiffs will be a party to any such hearing, and their counsel will be entitled to recover reasonable attorneys' fees and costs from Defendants, as set forth below in paragraph D.

**D.**     **Attorneys' Fees and Costs**

     The parties shall meet and confer regarding reasonable attorneys' fees and costs relating to Plaintiffs' motion to appoint a receiver, any motion that may be filed pursuant to paragraphs A.4, B.7.d, or B.7.e of this order, and any work performed after January 22, 2014.  Any disputes over attorneys' fees and costs that the parties cannot resolve independently will be submitted to Magistrate Judge Cousins.  Nothing in this order alters the right of Plaintiffs' counsel to receive previously agreed upon or previously earned fees and costs under the AMOU.

**E.      Role of the OPOA**

Unless otherwise ordered, the OPOA will retain its limited status in intervention until this case is terminated.  The Compliance Director will meet no less than once per quarter with the president of the OPOA to discuss the perspective of rank-and-file police officers on compliance efforts.

**F.      Further Proceedings**

The parties shall appear for a status conference on **June 6, 2013, at 10:00 AM**, to discuss Defendants' progress toward compliance.  The parties and Intervenor OPOA shall file a joint status conference statement on or before **May 24, 2013**.

The Court is hopeful that the appointment of an independent Compliance Director with significant control over the OPD will succeed – where City and OPD leaders have failed – in helping OPD finally achieve compliance with the NSA and, in the process, become more reflective of contemporary standards for professional policing.  If the remedy set forth in this order proves unsuccessful, and Defendants fail to make acceptable progress even under the direction of the person appointed pursuant to this order, the Court will institute proceedings to consider appropriate further remedies.  Such remedies may include, but are not limited to, contempt, monetary sanctions, expansion of the Compliance Director's powers, or a full receivership.

**IT IS SO ORDERED.**

Dated:   12/12/12

_____
THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

9

# EXHIBIT E

COMPLIANCE DIRECTOR ROBERT S. WARSHAW'S ADDENDUM to
OAKLAND POLICE DEPARTMENT
EXECUTIVE FORCE REVIEW BOARD REPORT
Use of Force No.: 18F-0067

February 19, 2019
page 1 of 4

The state entrusts law enforcement personnel with great authorities, and police officers have a compact with the community to use that authority judiciously and appropriately.  The use of deadly physical force by a police officer is the most extreme use of that authority.  Accordingly, any instances of the use of deadly force must be examined and investigated thoroughly.

In the case of Use of Force 18F-0067, a critical piece of evidence is the Portable Digital Recording Device (PDRD) footage from a sergeant who had the foresight to place his camera on the armored vehicle as it came to a stop at the scene of the shooting.  This camera provided an unobstructed view of the subject, Joshua Pawlik, and recorded his actions in the moments leading up to the officers' lethal discharge of their weapons.

For this case, I reviewed the Criminal Investigation Division (CID) investigation, the Internal Affairs Division (IAD) investigation, the Executive Force Review Board (EFRB) report, and Chief Anne E. Kirkpatrick's February 11, 2019 addendum to her February 8, 2019 general finding to the EFRB report.

I have found no reference to the use of the video during the questioning of the involved officers.  The Department failed to use the video to in any way challenge the involved officers' assertions about Mr. Pawlik's movements.  Yet their assertions are contradicted by the raw and enhanced versions of the video – both readily available to the investigators in this case.

An essential part of any investigation is the resolution of discrepancies.  IAD and CID are required to do this by Department policy, by the Negotiated Settlement Agreement (NSA), and by responsible police practices.  However, in the matter at hand, the investigators – both in their questioning and analysis – failed to address the inconsistencies between officers' statements and the video evidence.  The involved officers' descriptions of Mr. Pawlik's movement of his right hand range from a few inches to two feet.  In both the CID and IAD investigations, the Department failed to challenge the officers on these inconsistencies.  In addition, the questioning in both investigations was deficient, non-invasive, and replete with leading questions that served as attempts to support the justification of the officers' actions.

COMPLIANCE DIRECTOR ROBERT S. WARSHAW'S ADDENDUM to
OAKLAND POLICE DEPARTMENT
EXECUTIVE FORCE REVIEW BOARD REPORT
Use of Force No.: 18F-0067

February 19, 2019
page 2 of 4

Likewise, despite having access to the officers' statements and all versions of the video, the EFRB members did not address the apparent discrepancies between the statements and the video. With respect to the uses of force, the EFRB members appeared to accept IAD's recommendations at face value. The board was duty-bound to resolve those discrepancies if IAD did not. However, the board failed to do so. In her addendum, Chief Kirkpatrick repeatedly referenced the totality of the circumstances, but her assessment of these circumstances was both disappointing and myopic.

In this incident, officers were dealing with an unresponsive and apparently unconscious man who was laying on the ground between two houses with a handgun in his possession. Despite the presence of the firearm, there was no information that Mr. Pawlik was an immediate threat to anyone or had harmed anyone at that point. There were no citizens in immediate danger. The Department had established a perimeter, and officers were behind excellent cover afforded by the Bearcat armored vehicle they had summoned to the scene. OPD personnel had over 40 minutes to plan viable options for successfully resolving this situation.

Mr. Pawlik roused to consciousness, and the video shows his actions to be consistent with someone who was waking up and attempting to orient himself. He was moving minimally. He was a live human being – and any reasonable officer should not have expected him to remain perfectly still. His movements, as seen on the video, do not coincide with the movements to which the officers claim they reacted. Mr. Pawlik's slight movements did not constitute intent and a reasonable officer should not have concluded such. Any analysis of the officers' actions ignored the presence and intended utility of the Bearcat. Further, the EFRB Chair pointed out that officers did not use the armored vehicle as cover. They utilized it as a shooting platform.

In her addendum, Chief Kirkpatrick dismisses the possibility of sympathetic fire. While she readily accepts that all of the officers reacted to possible *visual* stimulation – as slight as it may have been – within a split-second of each other, she rejects the notion that they could respond similarly to *audio* stimulation. At the time of the shooting, four officers already had their rifles trained on Mr. Pawlik and were ready to shoot. Since the video does not show an overt threatening action on his part, sympathetic fire remains a viable explanation for the near simultaneous discharges by the officers, and the large number of rounds fired.

COMPLIANCE DIRECTOR ROBERT S. WARSHAW'S ADDENDUM to
OAKLAND POLICE DEPARTMENT
EXECUTIVE FORCE REVIEW BOARD REPORT
Use of Force No.: 18F-0067

February 19, 2019
page 3 of 4

While the video is the *key* piece of evidence in this case, it is not the *only* piece of evidence.  The quality of the IAD investigation is evidentiary as well.  The video itself is neutral – it shows what it shows.  The Department had the video professionally enhanced twice and analyzed once.  Further, during the course of our monitoring of this investigation, a Departmental sergeant attempted to enhance the video and provide an analysis of what it showed.  In the aftermath of the sergeant's presentation, the Chief discounted its usefulness, quality, and accompanying analysis.  In fact, the Chief informed me that the Department would not consider this analysis in the investigation of this case as she considered it substandard and an embarrassment.  Nevertheless, it was prominently referenced in the IAD investigation, which was presented to the EFRB.

I agree with the EFRB Chair in his assessment that when examining the circumstances in their totality, Sergeant Negrete's conduct constituted gross dereliction of duty.  As part of his reasoning, the EFRB Chair cited multiple failures on the part of Sergeant Negrete.  He deployed his own rifle as part of the Designated Arrest Team (DAT), though he had designated two officers with rifles as primary cover officers.  He assumed the role of both team leader and talker/cuffer, which divided his attention and did not allow him to effectively supervise the team.  He failed to plan for a foreseeable exigency: Mr. Pawlik awakening and not complying with commands.  The most important point the EFRB Chair made is that the outcome of this incident was so severe that it needed to be considered when determining whether Sergeant Negrete's conduct rose to the level of gross negligence.

The review in this case begs for consideration of the totality of circumstances in the encounter between the officers and Mr. Pawlik.  The event was fully captured on the video from a body-worn camera.  Neither the Executive Force Review Board nor Chief Kirkpatrick adequately considered the event as a whole.

After reviewing all of the investigations undertaken by the Department and the resultant deliberations of the Executive Force Review Board, I reject the Chief's principal conclusions in this matter.

COMPLIANCE DIRECTOR ROBERT S. WARSHAW'S ADDENDUM to
OAKLAND POLICE DEPARTMENT
EXECUTIVE FORCE REVIEW BOARD REPORT
Use of Force No.: 18F-0067

February 19, 2019
page 4 of 4

My determinations of findings are as follows:

Sergeant Negrete, Officer Berger, Officer Hraiz, and Officer Tanaka; Allegation: Violation of MOR 370.27-1 (Level 1) Use of Force – *Sustained.*

Officer Phillips, Allegation: Violation of MOR 370.27-1 (Level 2) Use of Force – *Sustained.*

Officer Tanaka, Allegation: Violation of MOR 314.39-2, Performance of Duty-General for failure to advise the Communications Division of his rifle deployment in violation of DGO K-06 – *Sustained.* I concur with the EFRB's reasoning and determination.

Officer Tanaka, Allegation: Violation of MOR 314.39-2, Performance of Duty-General for self-deploying as lethal cover – *Not Sustained.*

Lieutenant Yu, Allegation: Violation of MOR 234.00-2, Failure to fulfill his command responsibilities – *Sustained.*

Sergeant Negrete, Allegation: Violation of MOR 285.00-1, Failure to Supervise – *Sustained.*

Chief (Ret.) Robert S. Warshaw

*Compliance Director*

# EXHIBIT F



CITY OF OAKLAND

CITY HALL • 1 FRANK H. OGAWA PLAZA • OAKLAND, CALIFORNIA 94612
Police Commission

TO:      Lieutenant Angelica Mendoza, Office of Inspector General, Oakland Police
         Department

FROM:    Oakland Police Commission Chair Regina Jackson, Commissioner Jose
         Dorado, Commissioner Edwin Prather

DATE:    Originally issued July 9, 2019, and amended July 15, 2019

RE:      Officer Involved Shooting of Joshua Ryan Pawlik, IAD and CPRA Case
         No. 18-0249

## [1] BACKGROUND AND PROCEDURAL HISTORY

On April 22, 2019, the Oakland Police Commission (the "Commission") received
a report from the Citizens Police Review Agency ("CPRA") containing CPRA's findings
and recommended level of discipline to be imposed on individual Oakland Police
Department ("OPD") Officers in regards to the Joshua Pawlik matter. The CPRA report
made the following conclusions:

|   | Allegations | CPRA's Findings and Recommended Discipline |
|---|---|---|
| 1 | OPD Officer Brandon Hraiz improperly used lethal force when he shot and killed Mr. Joshua Pawlik | Exonerated |
| 2 | OPD Officer Craig Tanaka improperly used lethal force when he shot and killed Mr. Joshua Pawlik | Exonerated |
| 3 | OPD Sergeant Francisco Negrete improperly used lethal force when he shot and killed Mr. Joshua Pawlik | Exonerated |

| 4 | OPD Officer William Berger improperly used lethal force when he shot and killed Mr. Joshua Pawlik | Exonerated |
|---|---|---|
| 5 | OPD Officer Josef Phillips improperly used force when he used less lethal force on Mr. Joshua Pawlik | Exonerated |
| 6 | OPD Sergeant Francisco Negrete failed to properly perform his duties as the DAT Supervisor | Sustained Class 2 Violation – Demotion |
| 7 | OPD Lt. Alan Yu failed to properly perform his duties as the Incident Commander | Sustained Class 2 Violation – Demotion |
| 8 | OPD Officer Craig Tanaka failed to advise Communications of his rifle deployment | Not Sustained |

Thereafter, in relation to OPD IAD and CPRA Case No. 18-0249, the Commission also received Compliance Director Chief Robert Warshaw's February 19, 2019 Addendum to the OPD's Executive Force Review Board Report, his June 12, 2019 Memorandum Re Discipline, and his June 27, 2019 supplemental document to his February 19, 2019 and June 12, 2019 Memoranda.  Through those three documents, Chief Warshaw's report made the following conclusions standing in the place of the OPD:

| | Allegations | Chief Warshaw's Findings and Recommended Discipline |
|---|---|---|
| 1 | OPD Officer Brandon Hraiz improperly used lethal force when he shot and killed Joshua Pawlik | Sustained Level 1 Violation - Termination |
| 2 | OPD Officer Craig Tanaka improperly used lethal force when he shot and killed Joshua Pawlik | Sustained Level 1 Violation - Termination |

| | | |
|---|---|---|
| 3 | OPD Sergeant Francisco Negrete improperly used lethal force when he shot and killed Joshua Pawlik | Sustained Level 1 Violation - Termination |
| 4 | OPD Officer William Berger improperly used lethal force when he shot and killed Joshua Pawlik | Sustained Level 1 Violation - Termination |
| 5 | OPD Officer Josef Phillips improperly used force when he used less lethal force on Mr. Joshua Pawlik | Sustained Level 2 Violation - Termination |
| 6 | OPD Sergeant Francisco Negrete failed to properly perform his duties as the DAT Supervisor | Sustained Level 2 Violation - Termination |
| 7 | OPD Lt. Alan Yu failed to properly perform his duties as the Incident Commander | Sustained Level 2 Violation - 5-Day Suspension |
| 8 | OPD Officer Craig Tanaka failed to advise Communications of his rifle deployment | Not Sustained |

Section 2.45.130 of the Oakland Municipal Code provides in pertinent part that "A separate Discipline Committee will be established for each Department sworn employee discipline or termination case. The Chairperson of the Commission shall appoint three (3) Commission members to serve on a Discipline Committee, and shall designate one of these three (3) Commission members as the Chairperson. The Discipline Committee shall decide any dispute between the Agency and the Chief regarding the proposed or final findings or proposed or final level of discipline to be imposed on a Subject Officer."

In accordance with the above-listed conflicting findings and proposed discipline by CPRA and Chief Warshaw, on June 13, 2019, the Commission established a Discipline Committee (the "Committee") consisting of Commission Chair Regina Jackson, Commissioner Jose Dorado and Commissioner Edwin Prather. Chair Jackson was designated the Chair of the Committee.

The Committee conducted meetings on July 1, 2, 5, 7 and 9, 2019 to consider all of the issues at hand regarding the charge of the Committee as discussed below.

## [2] THE CHARGE OF THE DISCIPLINE COMMITTEE

Based on the findings and proposed discipline from CPRA and Chief Warshaw, the Committee identified the following issues before it:

| | Allegations | Status |
|---|---|---|
| 1 | OPD Officer Brandon Hraiz improperly used lethal force when he shot and killed Joshua Pawlik | Both the violation and discipline, if any, is to be determined by the Committee |
| 2 | OPD Officer Craig Tanaka improperly used lethal force when he shot and killed Joshua Pawlik | Both the violation and discipline, if any, tis o be determined by the Committee |
| 3 | OPD Sergeant Francisco Negrete improperly used lethal force when he shot and killed Joshua Pawlik | Both the violation and discipline, if any, is to be determined by the Committee |
| 4 | OPD Officer William Berger improperly used lethal force when he shot and killed Joshua Pawlik | Both the violation and discipline, if any, is to be determined by the Committee |
| 5 | OPD Officer Josef Phillips improperly used force when he used less lethal force on Mr. Joshua Pawlik | Both the violation and discipline, if any, is to be determined by the Committee |
| 6 | OPD Sergeant Francisco Negrete failed to properly perform his duties as the DAT Supervisor | The Committee need only consider proposed discipline |
| 7 | OPD Lt. Alan Yu failed to properly perform his duties as the Incident Commander | The Committee need only consider proposed discipline |

| 8 | OPD Officer Craig Tanaka failed to advise Communications of his rifle deployment | The Committee need not consider |
|---|---|---|

## [3] UNIVERSE OF MATERIALS AVAILABLE TO THE COMMITTEE

In order to conduct its review, the Committee received and reviewed: the CPRA Investigative File; the CID Investigative File; the Internal Affairs Division Investigative File, including all video evidence and witness interviews; the Executive Force Review Board (EFRB) Report; the Supplemental IAD report based on the direction of the EFRB; the Imaging Forensics Report; OPD Chief Anne E. Kirkpatrick's Addendum to the EFRB Report; Chief Warshaw's Addendum to the EFRB Report; and the Chief Warshaw's Discipline Determination Memorandum.

The Committee also requested additional clarification and information from CPRA, specifically, Karen Tom, the CPRA Interim Director at the time the Pawlik report was filed. It should be noted that Ms. Tom refused to speak directly to the Committee and would only answer questions through the current Interim Director, Mike Nisperos.

## [4] THE COMMITTEE'S FACTUAL STATEMENT AND FINDINGS

The Committee finds the following incontrovertible facts: The officer-involved shooting (OIS), on March 11, 2018, of Mr. Pawlik involved the report of a man sleeping, unconscious or otherwise "passed out" and located on a walkway between two houses at 922 and 928 – 40th Street. The 911 call was received at 6:17 p.m. The man was later identified as Joshua Pawlik. Mr. Pawlik was described as also as having a handgun in his hand. Upon their arrival at the scene, OPD officers observed Mr. Pawlik and believed him to be sleeping or unconscious and under the influence of alcohol, while grasping a handgun. A Designated Arrest Team (DAT) was established to arrest Mr. Pawlik. The DAT set up a perimeter to clear the area of any citizens and a Bearcat armored vehicle was called to the scene.

Sergeant Negrete created a plan for Mr. Pawlik. Officers would challenge Mr. Pawlik if he woke up prior to the Bearcat's arrival and order Mr. Pawlik to drop the firearm. If the Bearcat was available to Officers, Sergeant Negrete planned that sirens and announcements would be made to Mr. Pawlik. If Mr. Pawlik was not responsive to sirens or announcements, Officers would deploy bean bags to Mr. Pawlik's shins and then potentially tazers to get Mr. Pawlik to surrender or wake up.

Once the Bearcat arrived at 7:04 p.m., the vehicle was parked at an angle next to the sidewalk in front of Mr. Pawlik. Several officers took positions on the Bearcat, using the Bearcat as cover, with their weapons drawn. From this position, Officers engaged with Mr. Pawlik. They attempted to rouse him with loud verbal commands. No sirens or loud noises were used. Instead, Officers yelled to Mr. Pawlik several times to "get your hand off the gun" and "don't move." In coming to consciousness, Mr. Pawlik lifted his head a couple of times and attempted to sit up by using his right elbow. At that point, at approximately 7:06 p.m., Sergeant Negrete and Officers Hraiz, Tanaka, Berger and Phillips fired upon Mr. Pawlik killing him.

The Committee finds that the most essential piece of evidence in its review and analysis to be the video from the Portable Digital Recording Device (PDRD) of OPD Sergeant Webber.[1]  The Committee also finds that the PDRD video speaks for itself. From their vantage point on top of the Bearcat, Officers engaged with Mr. Pawlik in an attempt to wake him. Officers shined a bright light on Mr. Pawlik in an apparent attempt to view Mr. Pawlik more clearly, but also to blind and confuse Mr. Pawlik. The PDRD video confirms that Mr. Pawlik's response to Officers attempting to rouse him was to act consistently as a man who was sleeping, unconscious or drunk and being startled and awoken from his slumber. In coming to consciousness, Mr. Pawlik lifted his head more than one time but was unsuccessful in other movements. Mr. Pawlik eventually attempted to sit up by using his right elbow. The PDRD video also confirms that at no time did Mr. Pawlik raise the handgun towards the officers or otherwise in a threatening manner towards Officers. Mr. Pawlik attempted to raise his head and sit up by using his right elbow for leverage. It was this movement that apparently caused Sergeant Negrete and Officers Hraiz, Tanaka, Berger and Phillips to fire upon Mr. Pawlik killing him.

The Committee does not find persuasive Officer testimony that Mr. Pawlik lifted moved or pointed the handgun in a threatening manner towards Officers. The PDRD video clearly shows that Mr. Pawlik did not lift, move or point the handgun in a threatening manner towards the Officers.

The Committee also finds instructive the PDRD's recording of Officer Berger's statement to Officer Phillips: "If that gun moves… bag him". This statement shows, at minimum, Officer Berger's desire to fire a bean bag at Mr. Pawlik based on any movement, not just threatening movement, or at worst, Officer Berger's desire to shoot a rifle round at Mr. Pawlik killing him. This line of thinking was inconsistent with Sergeant Negrete's plan to deploy bean bags to Mr. Pawlik's shins should Mr. Pawlik continue to be unresponsive.

---

[1] The Committee recognizes the foresight of Sgt. Webber who very smartly and appropriately placed his PDRD on top of the OPD's Bearcat armored vehicle prior to the unfolding of the OIS.

The PDRD video also clearly shows that Officers provided conflicting statements to Mr. Pawlik such as "don't move" and "move your hand away from the gun". However, the conflicting statements were not controlling as it appears that Mr. Pawlik was not able to comprehend what was being told him after having been awoken from his sleep or unconsciousness.

## [5] THE COMMITTEE'S FINDINGS

### OPD Officer Brandon Hraiz (Star 9285)

The Committee finds that Officer Hraiz discharged his rifle resulting in the death of Mr. Pawlik. This use of force was out of compliance with OPD policy and the allegation that Officer Hraiz violated MOR 370.27 – 1f Use of Physical Force – Level 1 is SUSTAINED.

The Committee concludes that TERMINATION is the appropriate discipline.

### OPD Officer Craig Tanaka (Star 9484)

The Committee finds that Officer Tanaka discharged his rifle resulting in the death of Mr. Pawlik. This use of force was out of compliance with OPD policy and the allegation that Officer Tanaka violated MOR 370.27 – 1f Use of Physical Force – Level 1 is SUSTAINED.

The Committee concludes that TERMINATION is the appropriate discipline.

### OPD Sergeant Francisco Negrete (Star 8956)

The Committee finds that Sergeant Negrete discharged his rifle resulting in the death of Mr. Pawlik. This use of force was out of compliance with OPD policy and the allegation that Officer Berger violated MOR 370.27-1f Use of Physical Force – Level 1 is SUSTAINED.

The Committee also finds that Sergeant Negrete failed in his supervision of other officers in violation of MOR 285.00-1 Supervisors-Authority and Responsibilities, Class I. The allegation against Sergeant Negrete in that regard is sustained.

The Committee concludes that TERMINATION is the appropriate discipline.

### OPD Officer William Berger (Star 9264)

The Committee finds that Officer Berger discharged his rifle resulting in the death of Mr. Pawlik. This use of force was out of compliance with OPD policy and the allegation that Officer Berger violated MOR 370.27 – 1f Use of Physical Force – Level 1 is SUSTAINED.

The Committee concludes that TERMINATION is the appropriate discipline.

**OPD Officer Josef Phillips (Star 9446)**

The Committee finds that Officer Phillips discharged his bean bag gun resulting in a use of force against Mr. Pawlik.  This use of force was not in compliance with OPD policy and the allegation that Officer Phillips violated MOR 370.27-1h Use of Physical Force – Level 2 is SUSTAINED.

The Committee concludes that TERMINATION is the appropriate discipline.

**OPD Lieutenant Alan Yu (Star 8605)**

Both CPRA and Chief Warshaw found that the allegation that Lieutenant Yu failed to properly perform his duties as the Incident Commander in violation of MOR 234.00-2 Command Officers – Authority and Responsibilities, Class II as SUSTAINED.

The Committee concludes that a DEMOTION is the appropriate discipline.

///