United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO NEGRETE, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF OAKLAND, et al.,<br><br>        Defendants. | Case No. 19-cv-05742-WHO<br><br>**ORDER ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS**<br><br>Re: Dkt. Nos. 25, 30 |

Four City of Oakland Police Officers and one Sergeant (collectively, the Officers) seek to overturn the decision of the Oakland Police Commission's (Commission) Discipline Committee terminating the Officers for uses of force and policy violations that led to the death of a homeless man in Oakland. The Officers argue that the City and the Commission improperly ignored the determination of former Police Chief Anne Kirkpatrick, who concluded that their uses of force were lawful and that no policy violations were committed, in favor of the contrary decision of the federal Compliance Director of the Oakland Police Department (OPD). They assert that the City and the Commission violated the plain language of the City's Charter in order to find a conflict with the determination of Commission's own investigatory body, the Community Police Review Agency (CPRA), which also concluded that the uses of force were lawful and that no policy violations were committed.

For the reasons explained below, the City's motion for Judgment on the Pleadings is GRANTED and the Officers' cross-motion is DENIED. The City acted in a way that was consistent with its rights under the Charter and its obligations under the Negotiated Settlement Agreement (NSA) and subsequent Orders entered by this court by determining that the Compliance Director's decision about discipline (overriding former Chief Kirkpatrick's decision) was the final decision of the Chief of Police. The Commission was within its rights and

obligations under the City Charter to find that a conflict existed between the OPD's final decision and the CPRA's decision and to have its Discipline Committee resolve that conflict.

BACKGROUND

## I.    COURT SUPERVISION OF THE OAKLAND POLICE DEPARTMENT

In 2003 the City of Oakland agreed to settle a civil rights lawsuit, *Delphine Allen, et al. v. City of Oakland, et al*., U.S. Northern Dist. Case No. C00-4599.  In the *Allen* case, the plaintiffs challenged a pattern of racist and unconstitutional practices committed by individually identified officers but allegedly permitted by and indeed caused in part by OPD's alleged culture of tolerance for and indifference to such behavior.  The City agreed to resolve that lawsuit through a Negotiated Settlement Agreement (NSA) overseen and enforced by this Court.[1]

The NSA included 51 Tasks, with numerous sub-parts, that the City agreed OPD and the City would need to satisfy.  It required the City to implement reforms to OPD's policies, including policies addressing adjudicating and imposing discipline on officers.  *See, e.g*., NSA at 24, 28, 33.

---

[1] The City requests the Court take judicial notice of various Court orders entered in *Allen* and public records; the NSA entered in *Allen* (Ex. A), 1/24/2012 Order in *Allen* (Ex. B.), 12/12/2012 Order in *Allen* (Ex. C), 7/22/2014 Order in *Allen* (Ex. D), Section 503 of the City's Charter (Ex. E), Section 604 of the City's Charter (Ex. F), Agenda Report re Charter Amendment (Ex. G), Discipline Committee Report (Ex. H), and OPD MOU (Ex. H).  Dkt. No. 26.  The City's unopposed Request for Judicial Notice of these Court Orders and public records [Dkt. No.26] is GRANTED.  The Officers request the Court take judicial notice of additional public records; Sections of Article XI of the Constitution of the State of California (Ex. A), portions of the City's Charter (Exs. B &C), NSA entered in *Allen* (Ex. D), November 2009 MOU in *Allen* (Ex. E), June 2011 Amended MOU in *Allen* (Ex. F), June 2012 Order in *Allen* (Ex. G), December 2012 Order in *Allen* (Ex. H), February 2014 Order in *Allen* (Ex. I), Section 604 of the City's Charter (Ex. J), City Attorney October 2017 Memorandum (Ex. K), City Attorney Ballot Summary (Ex. L), City Attorney Analysis (Ex. M), portion of the City's Municipal Code (Exs. N & O), City Attorney June 2018 Memorandum (Ex. P), EFRB's Report for Use of Force 18F-0067 (Ex. Q), Chief Addendum (Ex. R),  DA Report, (Ex. S), CPRA Report (Ex. T), Transcript of May 2019 Police Commission hearing (Ex. U). The Officers' unopposed Request for Judicial Notice [Dkt. No. 28] is GRANTED.  The Officers' unopposed Supplemental Request for Judicial Notice [Dkt. No. 35] requesting judicial notice of additional sections of the City Charter (Exs. A&B) is likewise GRANTED.  At the hearing, the Court noted that it intended to take judicial notice of three additional records under the doctrine of incorporation: the Compliance Director's (i) February 19, 2019 Addendum to EFRB Report; (ii) June 12, 2019 Memorandum re Discipline; and (iii) June 27, 2019 Supplement.  *See U.S. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (judicial notice is appropriate for a document that "is central to the plaintiff's claim" and "no party questions the authenticity of the document").  No party objected to the Court taking judicial notice of these three additional records and judicial notice will be taken of them.  Finally, the Officers' Request for Judicial Notice of the Performance Audit of the Oakland Police Commission and the Community Police Review Agency [Dkt. No. 38] is also GRANTED.

2

1    It established the position of a Monitor to review the Department's compliance with the NSA's

2    terms.  *Id*. at 43-54.  And it also provides that "in the event of substantial and/or chronic non-

3    compliance with provisions of this Agreement, the Court may impose such sanctions and/or

4    remedies as it deems just and necessary …"  *Id*. at 54.

5         The NSA was extended, with its terms incorporated, by two subsequent Memoranda of

6    Understandings; specifically, an MOU entered in 2009 and an Amended MOU in 2011.  In

7    January 2012, the court noted that "much significant work remains if the Department is ever to

8    achieve the promises of the [] NSA" and directed the Department to consult with the Monitor on

9    police officer personnel decisions, including in cases that involve lethal force.  Petition, ¶ 51;

10   January 2012 Order.  The court also required a procedure to review any City decision

11   implemented against the recommendation of the Monitor.  *Id*.

12        In October of 2012, the *Allen* plaintiffs filed a motion seeking to place the Department into

13   federal receivership because of the lack of progress on implementing the NSA and its Tasks.

14   *Allen v. Oakland*, Dkt. No. 752.  The parties (including the Oakland Police Officers' Association,

15   represented by the same counsel representing the Officers in this action) then engaged in court-led

16   settlement discussions and agreed to the appointment of a Compliance Director in addition to the

17   Monitor, who would be responsible for "overseeing the City and OPD's implementation and

18   compliance with the NSA and AMOU."  *Allen v. Oakland*, Dkt. No.  884-1 at 3.

19        On December 12, 2012, the court approved the parties' agreed settlement and established

20   the position of Compliance Director vested with "the same rights and privileges" as the Monitor.

21   Petition, ¶ 52; December 2012 Order 2.  That Order provides:

22             The Compliance Director will have authority to direct specific actions
              by the City or [Department] to attain or improve compliance levels,
23             or remedy compliance errors, regarding all portions of the NSA …,
              including but not limited to: … personnel decisions … Findings and
24             disciplinary actions in misconduct cases and use-of-force reviews …

25   *Id*. at 6.  The December Order also made it clear that the Compliance Director had "no authority

26   to rescind or otherwise modify working conditions referenced in the labor agreements between the

27   City and the OPOA as those contracts relate to any member up to and including the rank of

28   Captain."  *Id*. at 7.  "Working conditions" include those identified by the Meyers-Milias-Brown

United States District Court
Northern District of California

1    Act, California Government Code section 3500 et seq. ("MMBA"), the collective bargaining

2    agreement, and officers' "rights to arbitrate and appeal disciplinary action."  *Id.*

3            In February 2014, the court consolidated the powers of the Compliance Director and

4    Monitor into one position and appointed the existing Monitor, Chief Robert Warshaw, to fulfill

5    that joint role.  February 2014 Order at 2.  On July 22, 2014, the court issued an Order rejecting

6    the City Administrator's imposition of a different level of discipline on a police officer from what

7    the Compliance Director approved.  The court explained that the City Administrator's actions

8    "violated the orders of this Court" and reiterated that "no discipline in Class I misconduct cases

9    can be imposed absent the Compliance Director's direction or approval."  Petition, ¶ 55; July 2014

10   Order at 1.

11   **II.     POLICE COMMISSION**

12           In November 2016, the voters passed a Charter amendment titled "Measure LL."  Petition,

13   ¶ 16.  Measure LL added a new provision to the City's Charter, Section 604, establishing the

14   civilian Police Commission and the Commission's CPRA.  Section 604(a).  Section 604 sets forth

15   the procedure for the investigation of allegations of workplace misconduct against sworn members

16   of OPD and disciplinary determinations following such investigations.  Petition, ¶ 16; Section

17   604(f).  The CPRA, as the Commission's investigative body, was empowered to investigate public

18   complaints alleging misconduct by sworn members of the Department.  Petition, ¶ 18; Section

19   604(f).  Upon completion of an investigation, the CPRA must issue written findings and proposed

20   discipline to the Commission and the "Chief of Police."  Petition, ¶ 18; Section 604(f)(3).

21           With respect to discipline of OPD officers, Section 604 provides that if the Chief of Police

22   agrees with the CPRA's findings and proposed discipline, the Chief of Police shall notify the

23   subject officer of the findings and the Chief's intent to discipline.  Petition, ¶ 21; Section

24   604(g)(1).[2]  But if the Chief of Police disagrees with the CPRA's findings or proposed discipline,

25   the Chief of Police and the CPRA "shall submit their respective findings and/or proposed

26   _____

27   [2] Section 604(g)(1) provides:  "If the Chief of Police agrees with the Agency's findings and
     proposed discipline, he or she shall send to the subject officer notification of findings and intent to
28   impose discipline. The Chief of Police may send such notification to the subject officer before
     IAD has begun or completed its investigation."

                                                  4

discipline to a Discipline Committee," consisting of three Police Commission members.  Petition, ¶ 21; Section 604(g)(2).[3]  Section 604 requires the Discipline Committee to "resolve any dispute" between the determinations of the Chief of Police and the CPRA in a disciplinary proceeding. Section 604(g)(2).  The Chief of Police must then deliver to the subject employees the Discipline Committee's findings and proposed discipline. Petition, ¶ 20; Section 604(g)(2).

Chapters 2.45 ("Oakland Police Commission") and 2.46 ("Community Police Review Agency") of the Municipal Code codified the investigatory and discipline determination provisions of Section 604.  Petition, ¶ 24.  They include the process by which investigative findings and disciplinary determinations are made either by agreement between the Chief of Police and CPRA, or in case of a conflict between the two, a determination by the Discipline Committee. Petition, ¶24.

Once the City imposes discipline on an officer, the officer has a right to invoke pre- and post-deprivation due process and administrative appeal rights to contest the discipline.  Petition, ¶ 20.

### III.    PAWLIK SHOOTING, INVESTIGATIONS, PROCEEDINGS, AND DISCIPLINE

On March 11, 2018, the Officers responded to a "concerned resident's call about a man who was holding a firearm and situated between two residential buildings."  Petition at 2.  The man was later identified as Joshua Pawlik.  The Officers describe the pertinent facts as follows: "Upon arriving on scene and confirming that the suspect was armed with a pistol, Petitioners set a perimeter and engaged in a concerted effort to disarm the suspect and bring him into custody without incident or the need for force.  After peacefully attempting to disarm the suspect,

---

[3] Section 604(g)(2) states: "If the Chief of Police disagrees with the Agency's findings and/or proposed discipline, the Chief of Police shall prepare his or her own findings and/or proposed discipline which shall be submitted to a Discipline Committee comprised of three Commissioners. The City Administrator shall not have authority to reject or modify the Chief of Police's findings and proposed discipline. The Agency's findings and proposed discipline shall also be submitted to the Discipline Committee which shall review both submissions and resolve any dispute between the Agency and the Chief of Police. Based solely on the record presented by the Agency and the Chief of Police, the Discipline Committee shall submit its final decision regarding the appropriate findings and proposed discipline to the Chief of Police who shall notify the subject officer. The City Administrator shall not have the authority to reject or modify the Discipline Committee's final decision regarding the appropriate findings and level of discipline. The Discipline Committee shall not have the authority to conduct its own investigation."

United States District Court
Northern District of California

1    including multiple direct commands to 'get your hand off the gun,' the suspect failed to comply

2    and instead pointed the firearm towards the officers, prompting Petitioners Negrete, Berger, Hraiz

3    and Tanaka to discharge their firearms in self-defense, and Petitioner Phillips to fire a non-lethal

4    (bean bag) round in self-defense." *Id*. at 2-3.  Pawlik died on scene.  *Id*.

5         Following the shooting, OPD initiated both a criminal investigation and an administrative

6    investigation into the Officers' conduct.  Both investigations concluded that the Officers' conduct

7    was lawful and within OPD policy.  Petition ¶¶ 34-35.  As required by its policies, OPD convened

8    an "Executive Force Review Board" (EFRB) comprised of OPD command officers.  The EFRB

9    also concluded that the Officers' conduct was lawful and within OPD Policy.  EFRB Report, Dkt.

10   No. 28-2, Ex. Q.  Upon her review of the EFRB Report, former Chief Kirkpatrick determined that

11   the Officer's conduct was lawful and within OPD policy. February 8, 2019, Chief's Addendum to

12   EFRB, Dkt. No. 28-2, Ex. R.

13        However, the Compliance Director saw the incident differently.  He found that the Officers

14   improperly used lethal force in violation of policy and recommended termination.  *See* February

15   19, 2019 Addendum to EFRB Report; June 12, 2019 Memorandum re Discipline, and June 27,

16   2019 Supplement.  Ex. 26-1, Ex. H.

17        During this same general period, the shooting was investigated by the Commission's

18   CPRA.  On April 22, 2019, the CPRA concluded that the Officers' conduct was lawful and within

19   OPD policy.[4]  Dkt. No. 28-3, Ex. T.

20        Understanding that there was a conflict between the final determination of OPD – as the

21   Compliance Director's decision was the final department position and stood in the place of former

22   Chief Kirkpatrick's overruled decision – and the CPRA's findings, a Discipline Committee of the

23   Commission was formed on June 13, 2019.  Dkt. No. 26-1, Ex. H.  On July 9, 2019, as amended

24   on July 15, 2019, the Discipline Committee issued its report, concluding that the Officers' uses of

25   force were out of compliance with OPD policy and determining that termination was the

26   _____

27   [4] The CPRA sustained a "Class 2 violation" against defendant Negrete for "failing to properly
     perform his duties as the DAT Supervisor" and recommended a demotion.  Dkt. No. 28-3, Ex. T.

28   The Compliance Director sustained this allegation but recommended termination.  Dkt. No. 26-1,
     Ex. H.

appropriate discipline for each Officer.  Dkt. No. 26-1, Ex. H.  The Discipline Committee's conclusions were delivered to the Chief of Police.  The Officers, who had been placed on administrative leave in March 2019, were terminated.[5]

The City scheduled pre-deprivation hearings for each officer before a neutral hearing officer in accordance with *Skelly v. State Pers. Bd.*, 15 Cal. 3d 194 (1975).  The Officers provided substantive responses to the *Skelly* hearing officer; arguing both that the Discipline Committee was without jurisdiction to impose discipline on the Officers and that the City did not have just cause to terminate them.  Lopes Decl., Ex. E-I.

## IV.    THE OFFICERS' PETITION AND CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

On August 12, 2019, the Officers filed a Petition for Writ of Mandate and Complaint for Declaratory relief in Alameda County Superior Court.  Dkt. No. 1-2, Ex. A (Petition).  The Petition was removed by defendants to federal court on September 12, 2019 and reassigned to me as a case related to *Allen v. Oakland*.  Dkt Nos. 1, 10.

In their Petition, the Officers allege that the City and Commission failed to follow the provisions of the City's Charter that established the Commission and govern the Commission's powers with respect to the investigation and discipline of OPD officers.  They assert that the Commission improperly ignored Chief Kirkpatrick's findings and instead interpreted the Compliance Director's findings to create a conflict with the CPRA's findings, thereby allowing the Commission's Discipline Committee to act to discipline and terminate the officers.  The Officers seek a judicial declaration forcing the City to "comply with the statutory procedure by which Oakland police officers are investigated for allegations of workplace misconduct and disciplined as set forth in the City of Oakland's Charter and Municipal Code.  Petitioners also seek a judicial declaration establishing the proper application of specified provisions of the City of

---

[5] As explained in the parties' papers, there was a dispute over the effective date of the Officers' termination; the Officers alleged that violations of the Brown Act occurred during the Police Commission's and/or Disciplinary Committee's votes regarding discipline.  *See* Dkt. No. 34-1, Ex. A.  However, the Officers' counsel confirmed during the May 20, 2020 hearing that the Officers' terminations were fully effective at that point.

United States District Court
Northern District of California

1   Oakland's Charter and Municipal Code relative to the investigation and discipline of Oakland

2   police officers." Petition at 1-2.

3          On March 23, 2020, the City and Police Commission (collectively, the City) filed a Motion

4   for Judgment on the Pleadings. Dkt. No. 25. The City argues that: (i) it acted as required by the

5   NSA, not in its discretion, and therefore a writ of mandamus is not appropriate; (ii) even if it did

6   act in its discretion, it did not abuse that discretion or fail in any duty it owed the Officers; and (iii)

7   the Petition should be stayed pending the outcome of the Officers' administrative appeals. Dkt.

8   No. 26. The Officers oppose the City's motion and cross-move for Judgment on the Pleadings,

9   asserting that: (i) the City violated the plain language of the City Charter and Municipal Code; (ii)

10  the *Allen* NSA and related Orders do not excuse the City's obligation to comply with those

11  provisions; (iii) the Officers are not required to exhaust their administrative remedies; and (iv) the

12  Court should issue immediate injunctive relief preserving the "status quo" at the time the Petition

13  was filed, when the Officers contend that they were still employed by the Department. Dkt. No.

14  27.

15                                    **LEGAL STANDARD**

16         A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c)

17  utilizes the same standard as a motion to dismiss for failure to state a claim under Federal Rule of

18  Civil Procedure 12(b)(6). *Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

19  1047, 1055 n.4 (9th Cir. 2011). Under both provisions, the court must accept the facts alleged in

20  the operative pleading as true and determine whether they entitle the plaintiff to a legal remedy.

21  *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (citation omitted). Either motion

22  may be granted only when it is clear that "no relief could be granted under any set of facts that

23  could be proven consistent with the allegations." *McGlinchy v. Shull Chem. Co.*, 845 F.2d 802,

24  810 (9th Cir. 1988) (citations omitted). Dismissal may be based on the absence of a cognizable

25  legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Robertson*

26  *v. Dean Witter Reynolds, Inc.*, 749 F. 2d 530, 534 (9th Cir. 1984).

27         A plaintiff's operative pleading must allege facts to state a claim for relief that is plausible

28  on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). A claim has "facial plausibility"

United States District Court
Northern District of California

8

1   when the party seeking relief "pleads factual content that allows the court to draw the reasonable

2   inference that the defendant is liable for the misconduct alleged." *Id.*  Although the court must

3   accept as true the well-pleaded facts in the operative pleading, conclusory allegations of law and

4   unwarranted inferences will not defeat an otherwise proper motion.  *See Sprewell v. Golden State*

5   *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  "[A] plaintiff's obligation to provide the 'grounds'

6   of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation

7   of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right

8   to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

9   (citations and footnote omitted).

**DISCUSSION**

11       The Officers argue that the NSA and subsequent Orders of this Court were not meant to

12   and cannot impair the City's "ministerial" obligations under state law, including its obligations

13   under the plain language of the Charter that governs when the Discipline Committee has

14   jurisdiction to form.  Under Section 604, the Officers contend that the Discipline Committee

15   should not have formed because there was no conflict between former Chief Kirkpatrick's

16   decision (Chief's Addendum) and the CPRA decision.  They assert that under Section 604, the

17   Discipline Committee may only resolve conflicts between the decisions of the "Chief of Police"

18   and the CPRA, not between the decisions of the Compliance Director and the CPRA, and

19   therefore that the Discipline Committee lacked the authority to impose discipline on the Officers.

20   They have raised this position repeatedly with OPD, the City Attorney's Office, and the *Skelly*

21   hearing officer.  Declaration of Zachery A. Lopes [Dkt. No. 34], Exs. A, B, D, E-I.

22       The legal basis for this argument is the principle that courts interpreting the language of

23   voter initiatives, like Measure LL, must give the language its ordinary meaning as "construed in

24   the context of the statute as a whole and the overall statutory scheme." *Robert L. v. Super. Ct.*, 30

25   Cal. 4th 894, 901 (2003), *as modified* (Aug. 20, 2003) (internal citations omitted).  The Officers

26   note that the term "Chief" is expressly defined as "the Chief of Police" in the enacting Municipal

27   Code Sections,  Municipal Code § 2.45.010; *see also Faulder v. Mendocino County Bd. of*

28   *Supervisors*, 144 Cal. App. 4th 1362, 1371 (Cal. App. 1st Dist. 2006) ("Terms defined by the

United States District Court
Northern District of California

9

statute in which they are found will be presumed to have been used in the sense of the definition.").  They contend that the voters could only have intended to confer decision-making authority on the "Chief of Police" in passing Measure LL, given that the guidance on Measure LL from the City Attorney's office explained that Measure LL allows a Discipline Committee to be formed to resolve conflicts between the decisions of the "Chief of Police" and the CPRA and that none of the ballot initiative materials or analyses presented to the voters in Oakland ever referred to the Compliance Director or the *Allen* Orders.  Officers' RJN, Exs. L, M, P.  In short, the Officers argue that because Section 604 and the related provisions of the Municipal Code specifically and repeatedly refer *only* to the decision of the "Chief of Police" and do not mention the Compliance Director or anyone else, much less the *Allen* NSA or subsequent orders, the Compliance Director's decision could not be used to create a conflict with the CPRA decision that would give the Disciplinary Committee jurisdiction to consider the matter.

The City responds that it was within its rights and duties to harmonize its obligations under the NSA and *Allen* Orders (especially in light of the Court's 2014 Order affirming that Class I disciplinary determinations were subject to the approval of the Compliance Director) and the provisions of Section 604 of the Charter, and that its conclusion was correct that the Compliance Director's decision overruling former Chief Kirkpatrick was *the final decision* of the Chief of Police as the last word from the Department itself.  The City also asserts that by agreeing to the NSA in general and to the December 2012 Order specifically, the City permissibly delegated final decision-making authority (or at least approval) on the specified types of promotions and discipline identified in the December 2012 Order to the Compliance Director in lieu of the Chief of Police, and that delegation was permissible – or at least not prohibited – by any provision in the Charter.  *See, e.g., Taylor v. Crane*, 24 Cal. 3d 442, 450 (1979) ("A city charter is construed to permit the exercise of all powers not expressly limited by the charter or by superior state or federal law.").  That delegation and agreement by the City and OPD – which existed before Measure LL was passed by Oakland's voters – was not undermined by the passage of Measure LL and adoption of Section 604.

The Officers answer that harmonization is not allowed and that the December 2012 Order

1    in *Allen*, giving the Compliance Director the ability to "direct specific actions by the City or OPD"

2    including "personnel decisions . . . and disciplinary actions in misconduct cases and use-of-force

3    reviews," directly conflicts with the Section 604 provisions vesting those determinations solely in

4    the Chief of Police (with the added oversight of the Discipline Committee of the Commission if

5    properly invoked).  December 2012 Order at 6.  The Officers contend that any attempt to deviate

6    from the provisions of Section 604 would likewise run afoul of Section 104 of the Charter, which

7    provides that all "officers and employees of the City now serving shall continue in their offices or

8    employments until removed or replaced in the manner prescribed by the authority of this Charter."

9         The Officers also point to Section 503 of the Charter that provides the City Administrator

10   with the authority, subject to other provisions in the Charter, to discipline and remove employees,

11   except that the City Administrator may "delegate" that authority to "directors or department

12   heads."  They contend that the Compliance Director is not a director or department head or

13   otherwise responsible to the City Administrator, and there is no evidence of any such delegation

14   by the City Administrator to the Compliance Director.  The City and Department's agreement to

15   the December 2012 Order cannot, according to the Officers, be an implied delegation because

16   legal "settlements" have to be approved by the City Council and the City Council is expressly

17   prohibited from abridging the City Administrator's disciplinary authority.  *See* Charter Section

18   207.

19        The Officers misunderstand the December 2012 Order.  It implemented an agreement by

20   the City and the Department to give the Compliance Director the last word on Class I disciplinary

21   matters in order to avoid the alternative of potential receivership.  The July 2014 Order (which

22   addressed an attempt by the City Administrator to alter a decision on discipline agreed-to by the

23   Compliance Director) confirmed that very understanding by all involved.[6]

24        The passage of Measure LL by the voters of Oakland did not change this general

25

26   ───────────────

27   [6] As the both sides repeatedly note, the December 2012 Order gives the City the opportunity to
     seek relief from the court if it disagrees with a determination by the Compliance Director on the
     matters covered by that Order.  *See* December 2012 Order at C.7.(e); *see also* July 2014 Order at
28   1-2 ("If the City disagrees with the Compliance Director, it must follow the dispute resolution
     process set forth in the December 12, 2012 order.").

United States District Court
Northern District of California

1  understanding (other than removing the ultimate role of the City Administrator in the discipline

2  process and conferring that power on the Commission through the investigatory powers of the

3  CPRA and the resolution process of the Disciplinary Committee).  *See* Section 604(g)(2) ("The

4  City Administrator shall not have authority to reject or modify the Chief of Police's findings and

5  proposed discipline.").  Section 604's sole mention of the Chief of Police as the decision-maker

6  for the Department is not surprising and is understandable in a *Charter* amendment that

7  presumably was intended to last beyond the scope of this Court's supervision of OPD under the

8  NSA.[7]

9      The Officers point to no authority that prevents the City and OPD from *agreeing* to

10  provide the Compliance Director with powers that are not inconsistent with the Charter.  While the

11  Officers complain that the term "City" who agreed to the NSA and the December 12, 2012 Order

12  is "vague" and does not expressly address the powers of the City Administrator or any delegation

13  by the City Administrator, the Officers ignore that  the December 12, 2012 Order  was not adopted

14  by the City Council but signed by the City Attorney on behalf of the "City" *and* "OPD," and gave

15  discretion normally possessed by the Chief to the Compliance Director in certain defined

16  circumstances.  *See* Dkt. No. 884-1 at 1 (Proposed Order).

17      The Officers say that if the City genuinely believed that there was a conflict between the

18  NSA and *Allen* Orders and Section 604 that needed to be harmonized, the City was under a duty to

19  seek clarification or amendment of the *Allen* Orders from this court.  They point to the provision

20  of the NSA providing that:

21          If there is a significant change in a state law that impairs or impedes
22          the City's ability to implement this Agreement, then each of the
            parties reserves the right to seek declaratory relief or other relief from
23          the Court regarding implementation of the affected provisions of this
            Agreement in light of the change in state law.

24  NSA at 60; *see also* Petitioners' RJN, Exhs. E and F, p. 8 ("If the Court determines that a

25  provision of the MOU is unenforceable, such provision will be severed and all other provisions

26

27  ───────────────
    [7]  The fact that Chapter 2.45 of the Municipal Code, enacted to implement the terms of Section
28  604 of the Charter, defined "Chief" as "Chief of Police of the Oakland Police Department" does
    not change the analysis for the same reasons.  *See* Chapter 2.45.010.

12

United States District Court
Northern District of California

1   will remain valid and enforceable…. Nothing in the AMOU shall limit the power of the Oakland

2   City Council, the Mayor, the City Administrator, the City Attorney and the OPD from exercising

3   their authority and satisfying their duties as set forth in the Charter and other applicable law.").

4   They contend that these provisions recognize that court orders under the NSA did not foresee and

5   could not bind the City's ability to implement and adhere to changes in law, including the passage

6   of Measure LL and adoption of Section 604 making the "Police Chief's" decision the trigger for

7   any conflict with the CPRA's decision.  Following the passage of Section 604, the Officers

8   contend that the City was obligated to seek amendment of the *Allen* Orders (to the extent

9   necessary) as allowed under the *Allen* NSA and subsequent orders.  *See, e.g.*, NSA at 60 (giving

10  parties right to seek relief from the Court if a "significant change in a state law impair or impedes

11  the City's ability to implement" the NSA); *see also* AMOU at 8 ("Nothing in the AMOU shall

12  limit the power of the Oakland City Council, the Mayor, the City Administrator, the City Attorney

13  and the OPD from exercising their authority and satisfying their duties as set forth in the Charter

14  and other applicable law.").

15          The provisions allowing the City to seek guidance or amendment of the NSA or

16  subsequent Orders in light of "significant changes" in the law only apply if there are "significant

17  changes" that impair or impede the ability of the City to satisfy both its obligations under the NSA

18  and the court's implementing Orders and the City's Charter.  The City reasonably understood that

19  its agreed-to delegation of the Chief of Police's final decision-making authority in this instance, to

20  the Compliance Director acting in the shoes of the Chief was not in conflict with Section 604

21  during the duration of this court's supervision of OPD pursuant to the NSA and subsequent

22  Orders.[8]  It could not ignore that delegation or the Orders of this court.

23          This is not a situation where the City has entered a contract in violation of its Charter or

24  other binding law.  Nor is it a situation where the City has agreed to a consent decree that is

25  contrary to the City's obligations under its Charter or other binding law.  The *Allen* NSA and

26

27  _____

28  [8] Indeed, the Compliance Director's Addendum to the EFRP Report notes that he "rejects" the Chief's "principal conclusions in this matter."  February 19, 2019 Addendum to EFRB Report; *see also* June 27, 2019 Supplement ("I overturned the findings of Chief Anne E. Kirkpatrick").

13

implementing orders, in particular the December 2010 Order, agreed-to by both the City and the Department, gave the power to the Compliance Director to overrule the Chief's findings concerning discipline in defined and limited cases and in essence stand in the shoes of the Chief as the last word on discipline.  There is no conflict between the limited powers given to the Compliance Director during the time the NSA is in effect and the City Charter as amended by the voters of Oakland in creating the Commission.

In sum, the Commission was within its rights and obligations to convene its Disciplinary Committee to resolve the conflict between the CPRA's decision and the final decision of the Department, which in this instance was the Compliance Director's decision that stood in the place of the overruled determination made by former Chief Kirkpatrick.  The declarations of relief sought by the Petition are unwarranted and the Petition is DENIED.  I do not, therefore, need to reach the arguments put forward by the City regarding whether it had discretion to act, whether it abused any such discretion, and its request to stay this proceeding pending exhaustion of the pre and post-deprivation remedies available to the Officers under their MOU and the Police Officers Bill of Rights.

## CONCLUSION

The Officers' Motion for Judgment as a Matter of Law is DENIED and the City's Motion for Judgment as a Matter of Law is GRANTED.  The Clerk shall enter Judgment accordingly.

**IT IS SO ORDERED.**

Dated: June 12, 2020



William H. Orrick
United States District Judge